IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

NICOLA CHRISTOPHER BUCCI,

    Petitioner,                  No. 2: 11-cv-3147 GEB KJN P

  vs.

TIMOTHY E. BUSBY, et al.,

    Respondents.           FINDINGS AND RECOMMENDATIONS

                            /

I. Introduction

        Petitioner is a state prisoner, proceeding through counsel, with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2009 conviction for two counts of second degree murder.  He is serving a sentence of twenty-three years to life.

        On February 16, 2012, a hearing was held regarding petitioner's motion to stay this action pending exhaustion of additional claims.  William L. Schmidt appeared on petitioner's behalf.  Dorian C. Jung appeared on respondent's behalf.  For the following reasons, petitioner's motion should be granted.

II. Factual Background

        Knowledge of the factual background of petitioner's offenses is helpful in evaluating the pending motion.  For that reason, the factual summary contained in the opinion of

1

the California Court of Appeal is set forth herein:

      A. Prosecution Case

      1. Eye-witnesses Johnson and Fender

Witness Kim Johnson testified that around 6:30 p.m. on November 17, 2006, she was driving eastbound on Highway 12, a two-lane highway. Traffic was heavy in both the eastbound and westbound lanes. Johnson was driving at the 55-mile-per-hour speed limit. She looked in her rear view mirror and saw a silver SUV pass her vehicle in the westbound lane, then pull in front of her vehicle in the eastbound lane. The silver SUV was "driving really fast." Johnson estimated its speed at 65 to 70 miles per hour.

Passing was prohibited in this section of Highway 12. Nevertheless, the silver SUV pulled back into the westbound lane and accelerated up a hill, attempting to pass more vehicles. At the crest of the hill, the SUV collided head-on with a small red car in the westbound lane. The SUV flipped in the air and landed in a field. The small car was severely damaged and burning in the westbound lane.

Johnson pulled over and ran to the small red car. The driver was screaming, and Johnson said she would get her out of the vehicle. A man (whom Johnson identified at trial as Bucci) also approached the small vehicle, and Johnson asked him "to go check the SUV to see if anybody was in the SUV was okay [ sic ]." Bucci responded, "It was me, I was driving." Johnson asked Bucci to help her extract the driver from the burning vehicle. Bucci threw up his hands and said, "Oh, my God. What I have done [ sic ]?" When Johnson again asked Bucci to help her, Bucci responded, "I can't," and walked away. Another person at the scene (Jerry Fender) helped Johnson remove the driver from the burning red car.

Jerry Fender testified that he was driving eastbound on Highway 12 around 6:30 p.m. on November 17, 2006. He confirmed that Highway 12 is a two lane highway with one eastbound lane and one westbound lane, with a speed limit of 55 miles per hour. Fender was travelling about 50 miles per hour behind two "semi tractor trail[e]rs." An SUV passed his vehicle at about 70-80 miles per hour, even though there was "a solid yellow line on the east bound lane indicating no passing." FN2 The SUV did not veer or move erratically, but proceeded in a "straight-ahead, aggressive passing maneuver like you would normally do on a flat stretch of road." The SUV accelerated eastbound in the westbound lane, passing one of the semi-trailers and attempting to pass the second. When the SUV reached the crest of a hill, it collided head-on with a red Toyota.

FN2. On the night of the accident, Fender told the police he

believed that Bucci's vehicle was traveling 65 to 70 miles per hour. By either account, it was at least 10 miles per hour over the posted speed limit.

After passing the collision, Fender made a U-turn, stopped his vehicle, and turned on his hazard lights to prevent other vehicles from colliding with the wrecked Toyota, which had come to a stop in the westbound lane. The SUV ended up in a field. When Fender saw that the Toyota was on fire, he retrieved a fire extinguisher from his vehicle and approached the Toyota, where he saw a woman and three young children inside.

2. Victim Jackson

Victim Regina Jackson testified that, around 6:30 p.m. on November 17, 2006, she was returning home to Fairfield from Rio Vista in her red Toyota Corolla. In the car with her were three passengers: her children Jordan and Immanuel; and Demari H., the child of a friend.

As Jackson drove westbound on Highway 12, she suddenly saw a "car coming head-on into us passing two diesel trucks-trying to pass two diesel trucks coming over a hill." Jackson testified, "I tried to go over to the right, but I couldn't. There was nowhere I could go." There was a head-on collision just as she crested the hill.

As a result of the collision, Jackson suffered debilitating injuries, including a broken femur, knee, hip, and foot, with additional injuries to her forehead, eye, and mouth. She remained in the hospital for over two months. Imannuel and Demari H. died as the result of the injuries they suffered in the accident; Jordan became paralyzed from the waist down.

3. Investigation

Jason Bryant, an emergency medical technician, responded to the scene. Bryant contacted Bucci and found him to be uninjured except for pain in his elbow and back. Bucci stated he was the driver of one of the vehicles in the collision. He told Bryant that he believed he "fell asleep at the wheel." Bucci appeared emotionally upset and in tears, but was "cogent and responsive" to questions and gave "logical, reasonable answers."

California Highway Patrol Officer Patricia Rodriguez conducted an accident investigation at the scene. She confirmed there was a solid yellow line indicating a no-passing zone for eastbound traffic going up the hill where the collision occurred. She concluded that the red Toyota was going westbound and was struck head-on by the SUV that was travelling eastbound in the westbound lane.

California Highway Patrol Officer Michael Ervin also responded to the scene. Ervin contacted Bucci, who was cogent and lucid and admitted he was the owner and driver of the SUV. According to the officer's report, Bucci told the officer: He "momentarily fell asleep, dozed off, realized he was traveling in the wrong lane. Tried to speed up to pass a truck that was alongside of him. Saw the victim vehicle coming towards him. And swerved to the left, and the impact took place."

Officer Ervin asked Bucci if he had any health problems that might have contributed to the accident. Bucci replied that he had sleep apnea, but he denied being tired at the time of the accident. He did not claim to have been exposed to any substance that could cause him to lose consciousness.

Based upon witness interviews and investigation of the scene, Officer Ervin concluded that Bucci had violated the Vehicle Code by crossing over a solid yellow roadway line that prohibited passing and by attempting to pass while going up a hill. In short, Ervin asserted, Bucci was "attempting to pass a passenger vehicle and two semi-trucks uphill going the wrong way." The officer acknowledged that it was highly dangerous to drive well in excess of the posted speed limit in order to pass multiple vehicles approaching the crest of the hill.

It was stipulated that testing found no drugs or alcohol in Bucci's system. There were no skid marks on the road indicating that Bucci tried to apply his brakes before the collision.

4. Bucci's Prior Fatal Collision in 1994

The prosecutor introduced evidence that Bucci was involved in a head-on collision on Highway 80 in January 1994. Travelling westbound, Bucci's pickup truck proceeded on the right shoulder for over one thousand feet, then veered across the two westbound lanes and the dirt center median before colliding head-on with a Cadillac sedan in the eastbound lane. The occupants of the Cadillac died as a result of the collision. At the scene, Bucci told California Highway Patrol Officer Ty Brown that he had been up all night gambling at casinos in Reno. He also admitted drinking alcohol and smoking marijuana. Bucci stated that he apparently fell asleep or blacked out while driving and awoke just before the collision. Officer Brown concluded that the circumstances of the accident were consistent with Bucci's claim.

B. Defense Case

1. Bucci

As to the 1994 traffic accident, Bucci explained that he had been awake for over 30 hours and fell asleep at the wheel; when he

4

woke up, his car was out of control and he collided with another car.

As to the charged crimes, Bucci testified that on Friday, November 17, 2006, he was working as a sous chef at Google's main headquarters in Mountain View. Over the weekend Google was going to conduct tests related to transferring from electrical power to solar power, and during those tests, the electrical energy would be shut off. Therefore, 150 pounds of dry ice had been placed in a 10-foot by 20-foot walk-in freezer. Bucci was not warned of any hazards of exposure to dry ice.

On November 17, Bucci inspected the food inventory of the walk-in freezer containing the dry ice. After 10-15 minutes inside the freezer, he became dizzy and short of breath. He left the freezer and, when he went back in to complete his work, experienced the same thing. He testified, "I really don't remember a lot of stuff after that second time." He had never experienced any adverse effects after being in the walk-in freezer before.FN3

FN3. Other Google employees confirmed at trial that dry ice was placed in the refrigerators and freezers and no safety instructions or information concerning the proper handling of dry ice were given to Bucci. One employee testified that Bucci had appeared healthy and normal at work, but later in the day he appeared drawn, pale, and ill. Bucci told him that while in one of the walk-in freezers, he experienced dizziness that caused him to fall on a rack and hurt his arm. He also complained of a severe headache.

Around 3:00 p.m., Bucci left work and began driving from Mountain View to Lodi. He testified that he could recall only "bits and pieces" of the evening. He did not know how he found his vehicle in the parking lot. He did not know how he got to Highway 12, which was not his intended route. He denied any recollection of driving up an incline or trying to pass a truck. He remembered "a Jack-in-the-Box and, uh, a tractor-trailer [to the right of him] and then, uh, lights, and I, uh-I had swerved, I swerved to the left and I saw the lights." Then the collision occurred. The next thing he remembered was being in an ambulance.

On cross-examination, Bucci acknowledged that he learned from the 1994 incident that you can likely kill someone if you fall asleep at the wheel. Bucci denied any recollection of telling EMT Bryant, at the scene of the 2006 accident, that he fell asleep at the wheel. Bucci also acknowledged knowing, as of November 2006, that passing on a two-lane highway could be dangerous, and passing in the wrong lane on a two-lane highway can be extremely dangerous to oncoming traffic. He was also aware that "passing uphill over a solid no-pass line towards the crest of a hill where you can't see is life-endangering," and "passing multiple vehicles at night uphill in excess of a speed limit over the solid line is likely to kill

somebody." Bucci asserted that he would never pass uphill in a no-passing zone and could not remember it happening.

2. Expert Witnesses

Bucci presented medical experts who testified that exposure to large amounts of carbon dioxide can result in hypoxia, or oxygen deprivation to the brain. Hypoxia can cause mental impairment and loss of cognitive function. Specific symptoms could include loss of memory and difficulties in attention and concentration. It might affect a person's ability to perform complex tasks such as driving an automobile at night and passing other motor vehicles.

Neuropsychologist Darcy Cox opined that Bucci's actions after being exposed to dry ice were consistent with his having a severe hypoxic episode: his lack of memory, changes in vision, feeling tired, feeling dizzy and confused, and driving out of his way. Dr. Cox also opined that Bucci was clinically depressed and was suffering from post-traumatic stress disorder based on his involvement in the previous fatal accident in 1994. Because of this disorder, she reasoned, Bucci must have assumed that the second accident in 2006 was caused because he fell asleep at the wheel again, and this may have been the reason he stated at the scene of the 2006 accident that he believed he fell asleep.

On November 28, 2011, petitioner filed the original petition raising the following claims: 1) denial of due process by admission of irrelevant and prejudicial evidence (claim one); 2) prosecutorial misconduct (claims two and seven); 3) denial of due process as a result of exclusion of evidence (claim three); 4) ineffective assistance of counsel (claims 4-6); 5) cumulative error (claim eight).

People v. Bucci, 2010 WL 2512732 at *1-5 (2010).

III. Discussion

The instant action raises the following claims: 1) admission of irrelevant evidence (claim one); 2) prosecutorial misconduct (claims two and seven); 3) improper exclusion of evidence (claim three); 3) ineffective assistance of counsel (claims four, five and six); and 4) cumulative error (claim eight).

Petitioner requests that this action be stayed while he exhausts his unexhausted claims pursuant to the procedures set forth in Rhines v. Weber, 544 U.S. 269 (2005).  In the alternative, petitioner requests that this action be stayed pursuant to the procedures set forth in

Kelly v. Small, 315 F.3d 1063 (9th Cir. 2003).

### A. Procedural Background

Knowledge of the procedural background of petitioner's post-conviction proceedings is relevant to the court's evaluation of the instant motion. Accordingly, the procedural background is set forth herein.

Petitioner was convicted on February 9, 2009. (Dkt. No. 1 at 1.) Petitioner appealed to the California Court of Appeal, raising the following issues: 1) trial court erred in admitting prior bad act evidence in violation of petitioner's federal constitutional rights; 2) insufficient evidence to sustain the murder convictions in violation of petitioner's constitutional rights; 3) jury instruction error (2 claims); 3) trial court erred in excluding evidence that petitioner had been convicted and punished for prior bad acts; 4) prosecutorial misconduct; and 5) improper application of enhancements. (Dkt. No. 1 at 2) On June 23, 2010, the California Court of Appeal upheld petitioner's conviction. (Id.)

On September 1, 2010, the California Supreme Court denied petitioner's petition for review. (Id. at 2.) The petition for review raised the following claims: 1) improper application of enhancements; 2) trial court erred in admitting prior bad act evidence in violation of petitioner's federal constitutional rights; 3) implied malice second degree murder in vehicular homicides should not apply to non-driving under the influence cases; and 4) prosecutorial misconduct. (Id. at 3.)

On November 23, 2010, petitioner filed a habeas corpus petition in the Solano County Superior Court. (Id. at 3.) This petition alleged that the trial court erred in excluding receipts/invoices showing that dry ice was delivered to petitioner's place of employment on the day in question. (Id.) On January 21, 2011, the Superior Court denied the petition. (Id.)

Petitioner filed a habeas corpus petition in the California Court of Appeal raising two claims: 1) the trial court erred in excluding receipts/invoices showing that dry ice was delivered to petitioner's place of employment on the day in question; 2) appellate counsel was

7

ineffective for failing to raise this question on appeal.  (Id. at 4.)  On March 24, 2011, the California Court of Appeal denied this petition without prejudice to petitioner raising ground two in a petition filed in the Superior Court.  (Id. at 4.)

On April 29, 2011, petitioner filed a second petition in the Superior Court raising the same two claims raised in his petition filed in the California Court of Appeal.  (Id.)

A civil wrongful death case was filed against petitioner and the State of California regarding the incident on which his conviction is based.  (Dkt. No. 10-6 at 2.)  The trial in this case was held in June and July of 2011.  (Id. at 5.)  The jury assessed damages of 29 million dollars.  (Id.)

In late September 2011, petitioner's family retained the lawyer who is representing petitioner in the instant action, Mr. William L. Schmidt, to assess whether grounds existed to prosecute a habeas action.  (Dkt. No. 10-5 at 2.)  Mr. Schmidt reviewed documents from the civil action, including depositions taken of expert witnesses in June 2011.  (Id.)  According to Mr. Schmidt, the expert testimony revealed that petitioner had not committed an illegal act by crossing a double-yellow line when he initiated his passing maneuver, but also that Highway 12 was defective in its design, construction and maintenance, and that the State of California was aware of those deficiencies for several years preceding the November 2006 incident on which petitioner's conviction is based.  (Id.)  According to Mr. Schmidt, the evidence at the civil trial established, as conceded by the State of California, that an adequate line-of-sight in the area of the collision for a two-lane highway at 55 mph was at least 1,950 feet, but on Highway 12 it was only 300-350 feet; that the shoulders on either side of the roadway should have been at least 8 feet wide, but in fact did not exist on Highway 12.  (Id.)

Mr. Schmidt also represents that petitioner's memory of the accident was so faulty that he could not swear that he had not crossed the double yellow line.  (Id. at 2.)  Mr. Schmidt states that petitioner still lacks personal knowledge of that fact.  (Id.)

On November 28, 2011, Mr. Schmidt filed the instant petition on petitioner's

behalf. (Dkt. No. 1.) On or around January 6, 2012, Mr. Schmidt filed a habeas corpus petition in the Solano Superior Court raising the unexhausted claims. (Dkt. No. 10-2.)

### B. Legal Standard for Stay and Abeyance

In Rhines v. Weber, 544 U.S. 269 (2005), the United States Supreme Court held that a district court is permitted to stay a mixed petition – a petition containing both exhausted and unexhausted claims – in "limited circumstances," so that a petitioner may present his unexhausted claims to the state court without losing his right to federal habeas review due to the relevant one-year statute of limitations. 544 U.S. at 273–275, 277–28. The "stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court." Id. at 277. Under Rhines, a district court must stay a mixed petition only if: (1) the petitioner has "good cause" for his failure to exhaust his claims in state court; (2) the unexhausted claims are potentially meritorious; and (3) there is no indication that the petitioner intentionally engaged in dilatory litigation tactics. Id. at 278.

"Pursuant to the Kelly procedure, (1) a petitioner amends his petition to delete any unexhausted claims; (2) the court stays and holds in abeyance the amended, fully exhausted petition, allowing the petitioner the opportunity to proceed to state court to exhaust the deleted claims; and (3) the petitioner later amends his petition and re-attaches the newly-exhausted claims to the original petition." King v. Ryan, 564 F.3d 1133, 1135 (2009) (citing Kelly, 315 F.3d at 1070–71.) Kelly requires the petitioner to delete unexhausted claims such that only exhausted claims are stayed. See King, 564 F.3d at 1135 (outlining the Kelly procedure).

In step three of the Kelly procedure, a petitioner is only allowed to add his newly-exhausted claims back into the federal petition if the claims either are independently timely under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") or "relate back" to the exhausted claims in the pending petition. See King, 564 F.3d at 1140–41. "An amended habeas petition does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the

1  original pleading set forth." Mayle v. Felix, 545 U.S. 644, 650 (2005).  A new claim "relates

2  back" to an existing claim if the two claims share a "common core of operative facts."  Id. at 659.

3  A new claim does not "relate back" to an existing claim simply because it arises from "the same

4  trial, conviction or sentence."  Id. at 663–64.

5        In contrast, under a stay predicated on Rhines, a petitioner need not worry about

6  the statute of limitations because his unexhausted claims never leave federal court.  See King,

7  564 F.3d at 1139, 1140, citing Rhines, 544 U.S. at 277.

8        C.  Description of Unexhausted Claims

9      *Claim 3*

10       Claim 3 alleges that the trial court improperly excluded evidence that petitioner

11 had, in fact, been convicted of crimes and punished for a 1994 accident in violation of

12 petitioner's right to due process, right to present a defense and right to confront witnesses.  The

13 background to this claim is contained in petitioner's description of claim one, set forth herein:

> Petitioner was charged with 2 counts of second degree murder under an implied malice theory based on a 2006 vehicle accident in which it was stipulated that no alcohol or drugs were a factor.  The trial court, over objection, allowed the prosecution to introduce evidence that in 1994 defendant had fallen asleep at the wheel, abruptly awoke when his vehicle ran off the right shoulder, overcorrected and crossed the center line, hitting another vehicle head-on and killing the 2 occupants.  The 2006 trial court instructed the jury to consider the 1994 other act evidence only for the purpose of proving that Petitioner "knew that falling asleep while driving is dangerous to human life."  The defense theory asserted in the 2006 case was involuntary intoxication by hypoxia, not that petitioner fell asleep, and petitioner testified that he was driving while sleepy was and is dangerous.  The prosecutor successfully objected to effort by Petitioner's counsel to admit evidence that Petitioner had been convicted/punished for 1994 accident, then argued to jury that "there's 4 dead bodies and 2 ruined bodies behind him;" "I submit to you, he got away with it before, when he dozed off, and he used the same excuse again."

24 (Dkt. No. 1 at 5.)

25       In unexhausted claim three, petitioner alleges that the trial court improperly

26 excluded evidence that petitioner had, in fact, been convicted of crimes and punished for the

10

1994 accident in violation of his constitutional rights. Petitioner contends that when defense counsel attempted to elicit from petitioner that he had not "gotten away with it," as argued by the prosecutor, the prosecutor objected and the trial court said, "Sustained, let's not go any further."

As noted above, petitioner alleges that while the factual basis of claim three was alleged in state court on direct appeal, the federal constitutional basis was not asserted, rendering this claim unexhausted. Johnson v. Zenon, 88 F.3d 828, 830 (9th Cir. 1996) ("If a petitioner fails to alert the state court to the fact that he is raising a federal constitutional claim, his federal claim is unexhausted regardless of its similarity to the issues raised in state court.")

*Claim Four*

Claim four alleges that counsel was ineffective for failing to adequately investigate the facts and circumstances of the 2006 accident. The petition describes the supporting facts of this claim as set forth herein:

> At a pretrial hearing, the then-assigned judge asked counsel if the trial would include testimony by "an accident reconstruction type of person." Defense counsel employed 2 neuropsychological-medical experts in support of the involuntary-intoxication-by-hypoxia theory. After Petitioner's conviction, a civil wrongful death action was commenced against Petitioner and the California Transportation Department ("CALTRANS"). Three accident reconstruction experts, testifying for plaintiffs and the defendant/Petitioner, opined, without contradiction, that when Petitioner moved into the on-coming (Westbound) lane of traffic to pass, he crossed a broken line on his side, indicating a lawful pass. This is directly contrary to the theory of the prosecution in the criminal case, which was that Petitioner had deliberately crossed a "double line" to pass. This evidence would not only have disputed the testimony of prosecution witnesses, it would have been solid foundation for the admission of the proffered-but-excluded defense evidence about flawed engineering of the highway, the substandard distances for passing and line of sight. Indeed, one of the juror's in the criminal case had emphatically averred, "[W]e convicted him for willfully and intentionally crossing the double yellow line in an effort to get around two big rigs and a passenger vehicle."

(Dkt. No. 1 at 10.)

Petitioner alleges that this claim is not exhausted because the factual basis of this claim did not become known until on or around June 2011 when experts testified in the related

1 civil case.

*Claims Five, Six, Seven and Eight*

In claim five, petitioner alleges that counsel was ineffective for failing to object and request curative instructions. The background to this claim is contained in the petition:

> The prosecutor argued to the jury that petitioner had "killed before and gotten away with it," even though the prosecutor knew petitioner had been convicted and punished for the 1994 accident. The prosecutor also argued that petitioner had to be in the wrong lane for 20 to 25 second; that the jurors should time how long that is; that the prosecutor had "never, ever been over in somebody else's lane ... for that long People like us would never have attempted that pass. We know that that's dangerous." As to the defense experts, the prosecutor told the jury, "... they're paid thousands and thousands of dollars to try and come in here and convince you of something that this [petitioner] didn't even tell the cops ... make no misunderstanding about it, these people are bought."

(Dkt. No. 1 at 12.)

In claim six, petitioner alleges that counsel was ineffective for failing to properly introduce evidence that petitioner had, in fact, been convicted and punished for the 1994 homicides. The background to this claim is contained in the petition:

> The prosecutor succeeded in introducing a prolonged (50 pages of Reporter's Transcript) description of the 1994 accident that resulted in the deaths of 2 people. On direct examination, petitioner's counsel did not ask petitioner if he had been convicted and sentenced for those fatalities. On recross examination, the prosecutor asked petitioner whether, with respect to the 2006 accident, he had thought back to the 1996 accident and decided to come up with an excuse for the 2006 incident as well. Petitioner's objection was sustained, but on sur-redirect examination, defense counsel asked petitioner if with respect to the 1994 accident he had got away with it. The prosecutor's objection was sustained. The jury was never advised that petitioner had been convicted and punished for the 1994 homicides.

(Dkt. No. 1 at 14.)

In claim seven, petitioner alleges that the prosecutor committed misconduct by urging the jury to consider the 1994 accident for purposes other than that instructed by the trial court. The background to this claim is contained in the petition:

> The prosecutor succeeded in introducing a prolonged (50 pages of Reporter's Transcript) description of the 1994 accident that resulted in the deaths of 2 people to prove petitioner's knowledge of the dangerousness of driving while sleepy. The trial court instructed the jury that this evidence could only be considered for the purpose of showing whether or not petitioner knew that driving while falling asleep was dangerous. The prosecutor argued to the jury that the 1994 accident wasn't introduced to show that petitioner was acting in conformity with his character when he again killed 2 people in 2006, but that if the jury looked at the evidence, it would see that petitioner was acting in conformity with his character.

(Dkt. No. 1 at 16.)

In claim eight, petitioner alleges that the multiple constitutional errors deprived him of his constitutional right to a fair trial. (Dkt. No. 1 at 18.)

Petitioner alleges that claims five through eight were not exhausted due to the "failings" of state appellate counsel.

D.  Analysis

*Claim Four*

Petitioner argues that he did not exhaust claim four, alleging ineffective assistance of counsel based on counsel's failure to obtain an accident reconstruction expert, prior to filing this action due to ineffective assistance of counsel. Petitioner argues that several district courts have found that ineffective assistance of counsel constitutes good cause for a Rhines stay. In particular, petitioner cites Judge Hollows' opinion in Abel v. Chavez, 2011 WL 4928689 (E.D. Cal. 2011).

In Abel, Judge Hollows found that a petitioner may be able to demonstrate good cause pursuant to Rhines if he can demonstrate that *post-conviction* counsel was ineffective.[1]

---

[1] Petitioner cites the following portion of Judge Hollows' opinion in Abel:

> It has elsewhere been observed that some courts have adopted the procedural default standard as the cause standard in Rhines context. Riner v. Crawford, 415 F.Supp.2d 1207, 1209–10 (D.Nev.

Judge Hollows cited other cases finding that ineffective assistance by *post-conviction* counsel constituted good cause.  In the instant case, petitioner does not claim that his appellate counsel was ineffective for failing to raise a claim alleging ineffective assistance of counsel based on trial counsel's failure to obtain an accident reconstruction expert.[2]

---

2006) (citing as the only in-circuit case, Hernandez v. Sullivan, 397 F.Supp.2d at 1207). However, the Riner court also went on to note that, cases "such as Jackson v. Roe, 425 F.3d 654 (9th Cir. 2005), and the remanded Rhines v. Weber, 2005 WL 3466015, *2–3 (D.S.D., December 19, 2005), conclude that the cause standard of Rhines requires a lesser showing than that for procedural default." Id., 415 F.Supp.2d at 1210. The district judge in Riner also noted, among the districts courts, a split of authority on the question of whether ineffective assistance of *post-conviction counsel* constitutes good cause to allow a stay of a federal petition, observing that at least five district courts have found that such a claim did qualify as good cause for failing to exhaust in state court and at least three did not. Id., at 1210–11. The Riner court concluded that:

> the good cause standard applicable in consideration of a request for stay and abeyance of a federal habeas petition requires the petitioner to show that he was prevented from raising the claim, either by his own ignorance or confusion about the law or the status of his case, or by circumstances over which he had little or no control, such as the actions of counsel either in contravention of the petitioner's clearly expressed desire to raise the claim or when petitioner had no knowledge of the claim's existence.

Riner, 415 F.Supp.2d at 1211.

Abel v. Chavez, 2011 WL 4928689 at *2-3 (emphasis added).

[2] In fact, petitioner's appellate counsel would not have been unable to raise this claim as it involved consideration of matters outside of the appellate record. People v. Anderson, 25 Cal.4th 543, 569 (2001) (where the record on direct appeal "does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation.")  Because petitioner's claim four involves matters outside the trial record, it is more appropriately raised in a state habeas corpus petition. People v. Mayfield, 5 Cal.4th 142, 188 (1993) (claims of ineffective assistance are generally rejected on direct appeal

For the following reasons, the undersigned finds that petitioner has shown good cause for failing to exhaust claim four because this claim is based on newly discovered evidence.

"Good cause" under Rhines is not clearly defined. However, the Ninth Circuit has explained that the Rhines "good cause" standard does not require a petitioner to show that "extraordinary circumstances" prohibited him from exhausting his claims. See Jackson v. Roe, 425 F.3d 654, 661–62 (9th Cir. 2005) ("good cause" appears to be less stringent than "extraordinary circumstances") (citation omitted). Nevertheless, the Ninth Circuit has indicated that although "extraordinary circumstances" are not required, a court must interpret Rhines's "good cause" requirement "in light of the Supreme Court's instruction in Rhines that the district court should only stay mixed petitions in 'limited circumstances.'" Wooten v. Kirkland, 540 F.3d 1019,1024 (2008). In particular, where a petitioner was well aware of the factual basis of claims that could have been raised and exhausted in the state courts before petitioner filed a federal habeas petition, "good cause" for a stay may not have been shown under Rhines. See, e.g., Jackson v. Roe, 425 F.3d 654, 661–62 (9th Cir. 2005) (remanding case to district court for, inter alia, evaluation of petitioner's reasons for not exhausting claims); Frluckaj v. Small, 2009 WL 393776, at *5–6 (C.D. Cal. 2009) (finding that where petitioner was aware of claim and could have presented claim to California state courts before filing federal habeas petition, petitioner had not shown either "cause" or "good cause" to satisfy Rhines).

The factual basis of claim four was discovered during a civil wrongful death suit filed against petitioner and the State of California. The factual basis of claim four was discovered well after petitioner had been convicted. Therefore, the factual basis of claim four was not known at the time petitioner filed his first round of state habeas petitions. In addition, petitioner admits that he, personally, did not and still does not know that he had not crossed a double yellow line. Petitioner did not become aware of this circumstance until the time of the

and more properly raised in a petition for habeas corpus, which can include declarations and other information outside the appellate record that reveal the reasons for the challenged conduct).

civil action. Under these circumstances, petitioner cannot be faulted for failing to exhaust this claim prior to filing the instant action. See Fetterly v. Paskett, 997 F.2d 1295, 1301 (9th Cir. 1993) (abuse of discretion found when court denied stay to exhaust newly discovered claims). Further, the fact that petitioner has already filed his petition with the Superior Court presenting his newly discovered claim weighs towards supporting AEDPA's objective of encouraging finality and undermines AEDPA's objective of streamlining federal habeas proceedings. Id. at 1534.

Finally, the undersigned finds that claim four is potentially meritorious and there is no indication that petitioner intentionally engaged in dilatory litigation tactics regarding this claim. Accordingly, petitioner's motion to stay claim four pursuant to Rhines should be granted.

*Claim Three*

Turning to claim three, petitioner suggests that appellate counsel was ineffective for failing to allege a constitutional claim in the state appeal.[3] As noted by respondent in the answer, petitioner was obviously aware of the factual basis of claim three. Petitioner has not demonstrated that he could not have exhausted this claim in a state habeas petition prior to filing the instant action. The alleged ineffective assistance of appellate counsel in failing to raise this claim did not prevent petitioner from exhausting this claim. Accordingly, the undersigned finds that petitioner has not demonstrated good cause for his failure to exhaust claim three prior to filing the instant action.

*Claims Five, Six and Seven*

Claims five, six and seven all concern the handling of petitioner's 1994 accident. Petitioner suggests that good cause under Rhines exists for his failure to exhaust these claims prior to filing the instant action because appellate counsel was ineffective for failing to raise these claims. However, the undersigned agrees with respondent that petitioner was aware of the

---

[3] It is not clear that this claim, alleging state law error only, was raised in the petition for review filed in the California Supreme Court.

16

1  factual basis of these claims because he was present at trial and personally observed the alleged
2  constitutional violations.  In addition, these claims are based on claims litigated in the direct
3  appeal, of which petitioner was aware.  Petitioner could have filed a habeas corpus petition to
4  exhaust these claims.  In addition, two of these claims allege ineffective assistance of counsel
5  which are more appropriately raised in a state habeas petition.  Accordingly, the undersigned
6  does not find that petitioner has demonstrated good cause for his failure to exhaust these claims
7  prior to filing the instant action.

*Claim Eight*

In claim eight, petitioner alleges cumulative error based on all of the claims raised in the instant action.  Because petitioner has not demonstrated good cause for his failure to exhaust his other unexhausted claims prior to filing this action, the undersigned does not find that petitioner has demonstrated good cause for failing to exhaust claim eight.

E.  Conclusion

For the reasons discussed above, the undersigned recommends that petitioner's motion to stay claim four pursuant to Rhines be granted.  Petitioner's motion to stay the remaining unexhausted claims pursuant to Rhines should be denied.  However, petitioner's request that these claims be stayed pursuant to the procedures set forth in Kelly should be granted.  Rather than ordering petitioner to file an amended petition containing his exhausted claims and claim four only, the claims stayed pursuant to Kelly should be stricken.  Following exhaustion of these claims, petitioner should be permitted to file an amended petition containing all of his exhausted claims.

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Petitioner's motion to stay (Dkt. No. 10) be granted and this action be administratively closed;

2. Petitioner's motion to stay claim four pursuant to Rhines be granted; petitioner's motion to stay claims three, five, six, seven and eight pursuant to Rhines be denied;

3. Petitioner's motion to stay claims three, five, six, seven and eight pursuant to Kelly be granted; these claims should be stricken from the petition.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: March 12, 2012

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

buc147.157