1

2

3

4

5

6

7

8               UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    NICOLA CHRISTOPHER BUCCI,              No.  2:11-cv-3147 GEB KJN P

12                 Petitioner,

13        v.                                 FINDINGS & RECOMMENDATIONS

14    TIMOTHY E. BUSBY,

15                 Respondent.

16

17    Introduction

18           Petitioner is a state prisoner, proceeding through counsel, with a petition for writ of

19    habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2009 conviction for two

20    counts of second degree murder.  He is serving a sentence of 23 years to life.

21           This action proceeds on the second amended petition filed November 24, 2014.  (ECF No.

22    32.)  Petitioner raises three claims:  1) trial court erred in admitting evidence of his 1994 collision

23    (identified as "claim 1"); 2) prosecutorial misconduct (identified as "claim 2"); and 3) ineffective

24    assistance of counsel (identified as "claim 4").[1]

25    ───────────────────
      [1]  Claims 3, 5, 6 and 8, raised in the first amended petition, were previously dismissed on
26    grounds that they were barred by the statute of limitations and procedurally barred.  (ECF No.
      31.)  Claim 7, raised in the first amended petition, was found to be subsumed by claim 4.  (Id.)
27    Therefore, the second amended petition raises the claims that were not previously dismissed, i.e.,
      claims 1, 2 and 4 raised in the first amended petition.  As indicated above, in the second amended
28    petition, petitioner continues to identify these claims as claims 1, 2 and 4.

1

1    After carefully reviewing the record, the undersigned recommends that the petition be

2    denied.

3    Standards for a Writ of Habeas Corpus

4    An application for a writ of habeas corpus by a person in custody under a judgment of a

5    state court can be granted only for violations of the Constitution or laws of the United States.  28

6    U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

7    application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California,

8    202 F.3d 1146, 1149 (9th Cir. 2000).

9    Federal habeas corpus relief is not available for any claim decided on the merits in state

10   court proceedings unless the state court's adjudication of the claim:

11   (1) resulted in a decision that was contrary to, or involved an
12   unreasonable application of, clearly established Federal law, as
     determined by the Supreme Court of the United States; or

13   (2) resulted in a decision that was based on an unreasonable
14   determination of the facts in light of the evidence presented in the
     State court proceeding.

15   28 U.S.C. § 2254(d).

16   Under section 2254(d)(1), a state court decision is "contrary to" clearly established United

17   States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in

18   Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a

19   decision of the  Supreme Court and nevertheless arrives at different result.  Early v. Packer, 537

20   U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).

21   Under the  "unreasonable application" clause of section 2254(d)(1), a federal habeas court

22   may grant the writ if the state court identifies the correct governing legal principle from the

23   Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's

24   case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because

25   that court concludes in its independent judgment that the relevant state-court decision applied

26   clearly established federal law erroneously or incorrectly.  Rather, that application must also be

27   unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough

28   that a federal habeas court, in its independent review of the legal question, is left with a 'firm

2

conviction' that the state court was 'erroneous.'") (internal citations omitted).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

The court looks to the last reasoned state court decision as the basis for the state court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  If there is no reasoned decision, "and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington, 131 S. Ct. at 784-85.  That presumption may be overcome by a showing that "there is reason to think some other explanation for the state court's decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

"When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits – but that presumption can in some limited circumstances be rebutted." Johnson v. Williams, 133 S. Ct. 1088, 1096 (2013).  "When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to" de novo review of the claim.  Id., at 1097.

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, the federal court conducts an independent review of the record.  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  Where no reasoned decision is available, the habeas petitioner has the burden of "showing there was no reasonable basis for the state court to deny relief." Harrington, 131 S. Ct. at 784.  "[A] habeas court must determine what arguments or theories supported or, . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786.

Factual Background

       The opinion of the California Court of Appeal contains a factual summary.  After independently reviewing the record, the undersigned finds this summary to be accurate and adopts it herein:

       A. Prosecution Case

       1. Eye witnesses Johnson and Fender

       Witness Kim Johnson testified that around 6:30 p.m. on November 17, 2006, she was driving eastbound on Highway 12, a two lane highway. Traffic was heavy in both the eastbound and westbound lanes. Johnson was driving at the 55 mile per hour speed limit. She looked in her rear view mirror and saw a silver SUV pass her vehicle in the westbound lane, then pull in front of her vehicle in the eastbound lane. The silver SUV was "driving really fast." Johnson estimated its speed at 65 to 70 miles per hour.

       Passing was prohibited in this section of Highway 12. Nevertheless, the silver SUV pulled back into the westbound lane and accelerated up a hill, attempting to pass more vehicles. At the crest of the hill, the SUV collided head on with a small red car in the westbound lane. The SUV flipped in the air and landed in a field. The small car was severely damaged and burning in the westbound lane.

       Johnson pulled over and ran to the small red car. The driver was screaming, and Johnson said she would get her out of the vehicle. A man (whom Johnson identified at trial as Bucci) also approached the small vehicle, and Johnson asked him "to go check the SUV to see if anybody was in the SUV was okay [ sic ]."  Bucci responded, "It was me, I was driving."  Johnson asked Bucci to help her extract the driver from the burning vehicle. Bucci threw up his hands and said, "Oh, my God. What I have done [ sic ]?"  When Johnson again asked Bucci to help her, Bucci responded, "I can't," and walked away. Another person at the scene (Jerry Fender) helped Johnson remove the driver from the burning red car.

       Jerry Fender testified that he was driving eastbound on Highway 12 around 6:30 p.m. on November 17, 2006. He confirmed that Highway 12 is a two lane highway with one eastbound lane and one westbound lane, with a speed limit of 55 miles per hour. Fender was travelling about 50 miles per hour behind two "semi tractor trail[e]rs."  An SUV passed his vehicle at about 70-80 miles per hour, even though there was a solid yellow line on the east bound lane indicating no passing. FN2 The SUV did not veer or move erratically, but proceeded in a "straight ahead, aggressive passing maneuver like you would normally do on a flat stretch of road." The SUV accelerated eastbound in the westbound lane, passing one of the semi trailers and attempting to pass the second. When the SUV reached the crest of a hill, it collided head on with a red Toyota.

4

FN2. On the night of the accident, Fender told the police he believed that Bucci's vehicle was traveling 65 to 70 miles per hour. By either account, it was at least 10 miles per hour over the posted speed limit.

After passing the collision, Fender made a U turn, stopped his vehicle, and turned on his hazard lights to prevent other vehicles from colliding with the wrecked Toyota, which had come to a stop in the westbound lane. The SUV ended up in a field. When Fender saw that the Toyota was on fire, he retrieved a fire extinguisher from his vehicle and approached the Toyota, where he saw a woman and three young children inside.

2. Victim Jackson

Victim Regina Jackson testified that, around 6:30 p.m. on November 17, 2006, she was returning home to Fairfield from Rio Vista in her red Toyota Corolla. In the car with her were three passengers: her children Jordan and Immanuel; and Demari H., the child of a friend.

As Jackson drove westbound on Highway 12, she suddenly saw a "car coming head-on into us passing two diesel trucks -- trying to pass two diesel trucks coming over a hill." Jackson testified, "I tried to go over to the right, but I couldn't. There was nowhere I could go." There was a head on collision just as she crested the hill.

As a result of the collision, Jackson suffered debilitating injuries, including a broken femur, knee, hip, and foot, with additional injuries to her forehead, eye, and mouth. She remained in the hospital for over two months. Imannuel and Demari H. died as the result of the injuries they suffered in the accident; Jordan became paralyzed from the waist down.

3. Investigation

Jason Bryant, an emergency medical technician, responded to the scene. Bryant contacted Bucci and found him to be uninjured except for pain in his elbow and back. Bucci stated he was the driver of one of the vehicles in the collision. He told Bryant that he believed he "fell asleep at the wheel."  Bucci appeared emotionally upset and in tears, but was "cogent and responsive" to questions and gave "logical, reasonable answers."

California Highway Patrol Officer Patricia Rodriguez conducted an accident investigation at the scene. She confirmed there was a solid yellow line indicating a no passing zone for eastbound traffic going up the hill where the collision occurred. She concluded that the red Toyota was going westbound and was struck head on by the SUV that was travelling eastbound in the westbound lane.

California Highway Patrol Officer Michael Ervin also responded to the scene. Ervin contacted Bucci, who was cogent and lucid and admitted he was the owner and driver of the SUV. According to the officer's report, Bucci told the officer: He "momentarily fell asleep,

dozed off, realized he was traveling in the wrong lane. Tried to speed up to pass a truck that was alongside of him. Saw the victim vehicle coming towards him. And swerved to the left, and the impact took place."

Officer Ervin asked Bucci if he had any health problems that might have contributed to the accident. Bucci replied that he had sleep apnea, but he denied being tired at the time of the accident. He did not claim to have been exposed to any substance that could cause him to lose consciousness.

Based upon witness interviews and investigation of the scene, Officer Ervin concluded that Bucci had violated the Vehicle Code by crossing over a solid yellow roadway line that prohibited passing and by attempting to pass while going up a hill. In short, Ervin asserted, Bucci was "attempting to pass a passenger vehicle and two semi trucks uphill going the wrong way." The officer acknowledged that it was highly dangerous to drive well in excess of the posted speed limit in order to pass multiple vehicles approaching the crest of the hill.

It was stipulated that testing found no drugs or alcohol in Bucci's system. There were no skid marks on the road indicating that Bucci tried to apply his brakes before the collision.

4. Bucci's Prior Fatal Collision in 1994

The prosecutor introduced evidence that Bucci was involved in a head on collision on Highway 80 in January 1994. Travelling westbound, Bucci's pickup truck proceeded on the right shoulder for over one thousand feet, then veered across the two westbound lanes and the dirt center median before colliding head on with a Cadillac sedan in the eastbound lane. The occupants of the Cadillac died as a result of the collision. At the scene, Bucci told California Highway Patrol Officer Ty Brown that he had been up all night gambling at casinos in Reno. He also admitted drinking alcohol and smoking marijuana. Bucci stated that he apparently fell asleep or blacked out while driving and awoke just before the collision. Officer Brown concluded that the circumstances of the accident were consistent with Bucci's claim.

B. Defense Case

1. Bucci

As to the 1994 traffic accident, Bucci explained that he had been awake for over 30 hours and fell asleep at the wheel; when he woke up, his car was out of control and he collided with another car.

As to the charged crimes, Bucci testified that on Friday, November 17, 2006, he was working as a sous chef at Google's main headquarters in Mountain View. Over the weekend Google was going to conduct tests related to transferring from electrical power to solar power, and during those tests, the electrical energy would be shut off. Therefore, 150 pounds of dry ice had been placed in a

10 foot by 20 foot walk in freezer. Bucci was not warned of any hazards of exposure to dry ice.

On November 17, Bucci inspected the food inventory of the walk in freezer containing the dry ice. After 10-15 minutes inside the freezer, he became dizzy and short of breath. He left the freezer and, when he went back in to complete his work, experienced the same thing. He testified, "I really don't remember a lot of stuff after that second time." He had never experienced any adverse effects after being in the walk in freezer before.FN3

FN3. Other Google employees confirmed at trial that dry ice was placed in the refrigerators and freezers and no safety instructions or information concerning the proper handling of dry ice were given to Bucci. One employee testified that Bucci had appeared healthy and normal at work, but later in the day he appeared drawn, pale, and ill. Bucci told him that while in one of the walk in freezers, he experienced dizziness that caused him to fall on a rack and hurt his arm. He also complained of a severe headache.

Around 3:00 p.m., Bucci left work and began driving from Mountain View to Lodi. He testified that he could recall only "bits and pieces" of the evening. He did not know how he found his vehicle in the parking lot. He did not know how he got to Highway 12, which was not his intended route. He denied any recollection of driving up an incline or trying to pass a truck. He remembered "a Jack in the Box and, uh, a tractor trailer [to the right of him] and then, uh, lights, and I, uh I had swerved, I swerved to the left and I saw the lights." Then the collision occurred. The next thing he remembered was being in an ambulance.

On cross examination, Bucci acknowledged that he learned from the 1994 incident that you can likely kill someone if you fall asleep at the wheel. Bucci denied any recollection of telling EMT Bryant, at the scene of the 2006 accident, that he fell asleep at the wheel. Bucci also acknowledged knowing, as of November 2006, that passing on a two lane highway could be dangerous, and passing in the wrong lane on a two lane highway can be extremely dangerous to oncoming traffic. He was also aware that "passing uphill over a solid no pass line towards the crest of a hill where you can't see is life endangering," and "passing multiple vehicles at night uphill in excess of a speed limit over the solid line is likely to kill somebody." Bucci asserted that he would never pass uphill in a no passing zone and could not remember it happening.

2. Expert Witnesses

Bucci presented medical experts who testified that exposure to large amounts of carbon dioxide can result in hypoxia, or oxygen deprivation to the brain. Hypoxia can cause mental impairment and loss of cognitive function. Specific symptoms could include loss of memory and difficulties in attention and concentration. It might affect a person's ability to perform complex tasks such as driving an automobile at night and passing other motor vehicles.

7

1
2
3
4
5
6

> Neuropsychologist Darcy Cox opined that Bucci's actions after being exposed to dry ice were consistent with his having a severe hypoxic episode: his lack of memory, changes in vision, feeling tired, feeling dizzy and confused, and driving out of his way. Dr. Cox also opined that Bucci was clinically depressed and was suffering from post traumatic stress disorder based on his involvement in the previous fatal accident in 1994. Because of this disorder, she reasoned, Bucci must have assumed that the second accident in 2006 was caused because he fell asleep at the wheel again, and this may have been the reason he stated at the scene of the 2006 accident that he believed he fell asleep.

7   People v. Bucci, 2010 WL 2512732 at *1-5 (2010).

8   Procedural Background

9   On August 27, 2014, the undersigned recommended that respondent's motion to dismiss

10  the first amended petition be granted in part and denied in part.  (ECF No. 30.)  The undersigned

11  recommended that respondent's motion to dismiss claims 3, 5, 6 and 8 be granted on the grounds

12  that these claims were barred by the statute of limitations and procedurally barred.  (Id.)  The

13  undersigned recommended that the motion to dismiss claim 7 be denied on the grounds that claim

14  7 was subsumed by claim 2.  (Id.)  The undersigned recommended that petitioner be ordered to

15  file a second amended petition raising claims 1, 2 and 4 only.  (Id.)

16  On October 20, 2014, the Honorable Garland E. Burrell adopted the August 27, 2014

17  findings and recommendations.  (ECF No. 31.)

18  On November 24, 2014, petitioner filed the second amended petition.  (ECF No. 32.)  On

19  January 12, 2015, respondent filed an answer.  (ECF No. 34.)  On February 6, 2015, petitioner

20  filed a reply to the answer.  (ECF No. 35.)

21  Discussion—Evidentiary Errors (Claim 1)

22  *Exhaustion*

23  Respondent argues that claim one is not exhausted.  A state prisoner must exhaust his or

24  her state court remedies before a federal court may consider granting habeas corpus relief.  28

25  U.S.C. § 2254(b)(1)(A); O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999).  To satisfy the

26  exhaustion requirement, a habeas petitioner must fairly present his or her federal claims in the

27  state courts in order to give the State the opportunity to pass upon and correct alleged violations

28  of the prisoner's federal rights.  Duncan v. Henry, 513 U.S. 364, 365, (1995) ( per curiam).  For a

8

1    petitioner in California state custody, this generally means the petitioner must have fairly

2    presented his or her claims in a petition to the California Supreme Court.  See O'Sullivan, 526

3    U.S. at 845 (interpreting 28 U.S.C. § 2254(c)); Gatlin v. Madding, 189 F.3d 882,888 (9th Cir.

4    1999) (applying O'Sullivan to California).

5            In the second amended petition, petitioner describes claim one as follows.  Petitioner

6    alleges that his right to due process was violated when the 2006 trial court admitted evidence of

7    the 1994 collision.  (ECF No. 32 at 14.)   Petitioner states that the trial court instructed the jury

8    that evidence of the 1994 collision could only be considered to prove his knowledge that driving

9    while sleeping was dangerous.  (Id. at 16-17.)  Petitioner argues that during the trial, he admitted

10   that he knew that driving while sleeping was dangerous.  (Id.)  Petitioner argues that because

11   there was no material dispute regarding whether he knew that driving while sleeping was

12   dangerous, evidence of the 1994 collision should not have been admitted.  (Id. at 16-17.)

13           Respondent argues that, in the original petition, petitioner argued in claim one that

14   evidence of the 1994 collision should not have been admitted because it was too dissimilar from

15   the charged offense.   In other words, respondent argues that claim one raised in the original

16   petition is different from claim one raised in the second amended petition.  Respondent argues

17   that petitioner exhausted claim one, as raised in the original petition, in his first petition for

18   review filed in the California Supreme Court.  (Id.)   Respondent argues that petitioner did not

19   exhaust the claim one he now raises in the second amended petition.

20           In the reply to the answer, petitioner appears to conflate the claims identified as claim one

21   in the original petition and claim one in the second amended petition.  Accordingly, in an

22   abundance of caution, the undersigned finds that petitioner is raising both of these claims.  The

23   parties do not dispute that petitioner has exhausted the claim identified as claim one in the

24   original petition.

25           For the reasons stated herein, the undersigned finds that the claim identified as claim one

26   in the second amended petition is exhausted, but most likely procedurally defaulted.  Petitioner

27   raised this claim in a habeas corpus petition filed in the California Court of Appeal.  (ECF No.

28   32-4.)  In this state habeas petition, petitioner identified this claim as claim G.  (Id. at 59-62.)

1    The California Court of Appeal denied claim G on the grounds that it was untimely or

2  successive, citing In re Clark, 5 Cal.4th 750, 774-75, 782-99 (1993), In re Robbins, 18 Cal.4th

3  770, 780-81 (1998), In re Swain, 34 Cal.2d 300, 303-04 (1949), and In re Reno, 55 Cal.4th 428,

4  472-74 (2012).  (ECF No. 32-3 at 1.)  The California Court of Appeal also denied claim G on the

5  grounds that it should have been raised on direct appeal, citing In re Dixon, 41 Cal.2d 756, 759

6  (1953.)  (Id.)  The California Supreme Court denied the petition for review raising claim G

7  without comment or citation.  (ECF No. 32-1 at 1.)  This petition for review is designated as case

8  no. S211701.  (Id)

9    The California Supreme Court dismissed claim G on procedural grounds.  See Ylst v.

10  Nunnemaker, 501 U.S. 797, 803 (1991) (when a higher state court has denied a petitioner's claim

11  without substantive comment, a federal habeas court "looks through" the denial to the last

12  reasoned decision from a lower state court to determine the rationale for the state courts' denials

13  of the claim).  Thus, claim one raised in the second amended petition is exhausted but most likely

14  subject to a procedural bar.

15    In his reply to the answer, petitioner argues that he also raised the claim identified as

16  claim one in the second amended petition in the petition for review filed in the California

17  Supreme Court on direct appeal, case no. S184817.  (ECF No. 35.)  In this petition for review,

18  petitioner argued that evidence regarding the 1994 collision should not have been admitted

19  because the 1994 accident was not sufficiently similar to the 2006 accident to make it relevant on

20  the issue of intent, i.e., claim one raised in the original federal petition.  (Petition for Review, p.

21  32, Respondent's Exhibit F filed January 14, 2015.)  Therefore, this petition for review did not

22  raise the claim now identified as claim one in the second amended petition.

23    For the reasons discussed above, the undersigned finds that the claim identified as claim

24  one in the second amended petition is exhausted but most likely subject to a procedural bar.

25  However, in the interests of judicial economy, the undersigned declines to order further briefing

26  on the issue of procedural bar, and instead addresses the merits of this claim herein.  See Franklin

27  v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002); Lambrix v. Singletary, 520 U.S. 518, 525

28  (1997).  Accordingly, the undersigned addresses the merits of both of petitioner's claims

10

1    challenging admission of evidence regarding the 1994 collision.

2         *Legal Standard for Evaluating Petitioner's Claims Challenging Admission of Evidence re:*

3    *1994 Accident*

4         The admission of evidence is not subject to federal habeas review unless a specific

5    constitutional guarantee is violated or the error is of such magnitude that the result is a denial of

6    the fundamentally fair trial guaranteed by due process.  See Henry v. Kernan, 197 F.3d 1021,

7    1031 (9th Cir. 1999).  The Supreme Court "has not yet made a clear ruling that admission of

8    irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant

9    issuance of the writ."  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that

10   trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under

11   Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established

12   federal law under § 2254(d)).

13        Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis

14   for granting federal habeas relief on due process grounds.  See Henry, 197 F.3d at 1031; Jammal

15   v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).  The due process inquiry in federal habeas

16   review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the

17   trial fundamentally unfair.  Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995).

18        The United States Supreme Court has left open the question of whether admission of

19   propensity evidence violates due process.  Estelle v. McGuire, 502 U.S. 62, 75 n.5 (1991).  Based

20   on the Supreme Court's reservation of this issue as an "open question," the Ninth Circuit has held

21   that a petitioner's due process right concerning the admission of propensity evidence is not

22   clearly established as required by AEDPA.  Alberni v. McDaniel, 458 F.3d 860, 866–67 (9th Cir.

23   2006); see,e.g., Larson v. Palmateer, 515 F.3d 1057, 1066 (9th Cir. 2008) (because the Supreme

24   Court expressly reserved the question of whether using evidence of prior crimes to show

25   propensity for criminal activity could ever violate due process, state court's rejection of claim did

26   not unreasonably apply clearly established federal law).

27   ////

28   ////

*Legal Background Regarding Petitioner's Conviction*

To assist the analysis of petitioner's claims challenging admission of evidence of the 1994 collision, the undersigned herein discusses the relevant legal background regarding petitioner's current conviction and admission of evidence of the 1994 collision.

Petitioner was convicted of second degree murder based on a theory of implied malice. "Second degree murder is defined as the unlawful killing of a human being with malice aforethought, but without the additional elements—i.e., willfulness, premeditation, and deliberation—that would support a conviction of first degree murder." People v. Nieto Benitez, 4 Cal.4th 91, 102 (1992). Malice may be express or implied. "It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. [Citation.]" Id.

"[S]econd degree murder with implied malice has been committed 'when a person does an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life....' [Citations.] Phrased in a different way, malice may be implied when defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life. [Citation.]" Id. at 104.

In the instant case, the prosecutor proceeded on two theories of implied malice. The prosecutor first argued that petitioner drove while he was tired, despite knowing the dangers of driving while sleepy. (See RT at 829-30 (prosecutor's closing argument). This theory was based on petitioner's statements to law enforcement officials and the EMT officer following the collision that he had dozed off. (Id.) The prosecutor argued that evidence of the 1994 collision demonstrated petitioner's knowledge of the danger of driving while sleeping. (Id.) The prosecutor's second theory of implied malice was that petitioner intentionally engaged in passing under dangerous conditions, i.e, petitioner was not sleeping. (Id. at 831-32.)

The jury was instructed that it could consider evidence of petitioner's 1994 collision for the limited purpose of determining whether petitioner knew that falling asleep while driving was dangerous to human life. (CT at 395.)

1    Petitioner was convicted of vehicular manslaughter as a result of the 1994 collision.  See

2    People v. Bucci, 2010 WL 2512732, at *11 (2010).  However, the jury in petitioner's 2006 trial

3    did not learn about petitioner's conviction and sentence as a result of the 1994 collision.  (Id.)

4    On direct appeal, petitioner argued that the trial court erred by precluding him from testifying that

5    he had been convicted and sentenced for vehicular manslaughter as a result of the 1994 collision.

6    (Id.)  The California Court of Appeal rejected this claim, finding that the trial court did not issue

7    an order precluding petitioner from explaining to the jury that he had been convicted and

8    sentenced for the 1994 fatalities.  (Id.)

9        *Analysis—Did Admission of Evidence re: 1994 Collision Violate Due Process Because*

10   *Petitioner Admitted Knowledge of Danger of Driving While Sleeping?*

11   As discussed above, evidence of the 1994 collision was admitted to demonstrate that

12   petitioner knew that driving while sleeping was dangerous.  Petitioner argues that he agreed in his

13   testimony that driving while sleeping is dangerous.  Petitioner argues that evidence of the 1994

14   collision should not have been admitted because his knowledge of the dangers of driving while

15   sleeping was not in dispute, i.e., he stipulated to this fact through his testimony.  In support of this

16   argument, petitioner cites a quotation which he attributes to People v. Schader, 71 Cal.2d 761,

17   775-76 n.13 (1969).  As noted by respondent, this quote, set forth herein, is actually from People

18   v. Thompson, 27 Cal.3d 303, 316 (1980):

19           In order to satisfy the requirement of materiality, the fact sought to
             be proved may be either an ultimate fact in the proceeding [FN13]
20           or an intermediate fact "from which such ultimate fact( ) may be
             presumed or inferred." [FN14]  (See Law Revision Com. comment
21           to Evid.Code, s 210.) Further, the ultimate fact to be proved must
             be "actually in dispute." (See Law Revision Com. comment to
22           Evid.Code, § 210.) If an accused has not "actually placed that
             (ultimate fact) in issue," evidence of uncharged offenses may not be
23           admitted to prove it. (People v. Thomas (1978) 20 Cal.3d 457, 467,
             143 Cal.Rptr. 215; see also People v. Antick (1975) 15 Cal.3d 79,
24           93; Jefferson, Cal. Evidence Benchbook (1972) § 21.3, p. 264.) The
             fact that an accused has pleaded not guilty is not sufficient to place
25           the elements of the crimes charged against him "in issue." (People
             v. Schader (1969) 71 Cal.2d 761, 775-776, fn.13.)
26

27   People v. Thompson, 27 Cal.3d at 316.

28   ////

As noted by respondent in the answer, the California Supreme Court has since expressly overruled the passage from <u>Thompson</u> quoted above:

> Defendant's reliance on <u>People v. Thompson</u> (1980) 27 Cal.3d 303, (<u>Thompson</u>), is misplaced. In <u>People v. Rowland</u> (1992) 4 Cal.4th 238, we disapproved the <u>Thompson</u> passage on which he relies. "Defendant also argues that the challenged 'other crimes' evidence cannot be deemed 'relevant' under Evidence Code section 210 to the broad issue of his intent in the incident as a whole. For support, he asserts that such intent was not a 'disputed fact' within the meaning of the statutory provision. It was. He relies essentially on language in <u>People v. Thompson</u> [, supra,] 27 Cal.3d 303, that 'The fact that an accused has pleaded not guilty is not sufficient to place the elements of the crimes charged against him "in issue."' But in <u>People v. Williams</u> [ (1988) ] 44 Cal.3d [883,] 907, footnote 7, we all but expressly disapproved <u>Thompson</u>'s language and held to the contrary. Therefore, a fact—like defendant's intent—generally becomes 'disputed' when it is raised by a plea of not guilty or a denial of an allegation. (Pen.Code, § 1019 ['The plea of not guilty puts in issue every material allegation of the accusatory pleading, except those allegations regarding previous convictions of the defendant to which an answer is required by [Penal Code] Section 1025.'].) Such a fact remains 'disputed' until it is resolved." (<u>Rowland</u>, at p. 260.)

<u>People v. Scott</u>, 52 Cal.4th 452, 470-71 (2011).

In <u>People v. Scott</u>, the California Supreme Court went on to state that a defendant may seek to limit the admissibility of other crimes evidence by stipulating to certain issues.  <u>See</u> 52 Cal.4th at 471.  The California Supreme Court went on to state that "[t]he general rule is that the prosecution in a criminal case cannot be compelled to accept a stipulation if the effect would be to deprive the state's case of its persuasiveness and forcefulness. [Citations.]" <u>Id.</u>  "[A] criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it."  <u>People v. Rogers</u>, 57 Cal.4th 296, 329 (2013).

As noted by respondent in the answer, numerous California courts have upheld the use of evidence of prior driving conduct to show implied malice in vehicular second degree murder cases.  <u>See People v. Ortiz</u>, 109 Cal.App.4th 104, 116 (2003); <u>People v. Brogna</u>, 202 Cal.App.3d 700, 706-10 (1988); <u>People v. McCarnes</u>, 179 Cal.App.3d 525, 532-33 (1986); <u>People v. Eagles</u>, 133 Cal.App.3d 330, 340 (1982).

"[C]ourts have recognized repeatedly that a motor vehicle driver's previous encounters with the consequences of recklessness on the highway - whether provoked by the use of alcohol,

of another intoxicant, by rage, or some other motivator - sensitizes him to the dangerousness of such life-threatening conduct." People v. Ortiz, 109 Cal.App.4th at 112.  "Here, the evidence of prior driving conduct was offered to prove an intermediate fact (knowledge that conduct is life threatening) necessary to the establishment of the ultimate fact of implied malice, an element in the charges of second degree murder." Eagles, 133 Cal.App.3d at 340.

For the reasons discussed above, the undersigned finds that admission of evidence of the 1994 collision, despite petitioner's admission of his knowledge of the dangers associated with driving while sleeping, did not violate fundamental fairness and his right to due process.  The evidence was properly admitted under California law in support of one of the prosecutor's theories of implied malice.

*Analysis:  Did Admission of Evidence of 1994 Collision Violate Due Process Because It Was Not Sufficiently Similar to 2006 Incident?*

The California Court of Appeal denied the instant claim for the reasons stated herein:

A. Admission of 1994 Fatal Traffic Collision

Bucci contends the court erred in granting the prosecutor's motion to admit evidence of the 1994 fatal collision that was caused when Bucci fell asleep, for the limited purpose of showing that Bucci knew in 2006 that falling asleep while driving on a highway is dangerous to life.  FN4 We disagree.

FN4. The prosecutor had also sought to introduce evidence of Bucci's prior convictions for vehicular manslaughter, which resulted from the incident. The prior convictions themselves were not specifically addressed at the hearing on the in limine motion. No evidence of the convictions or disposition was introduced at trial.

1. The Law

Evidence of uncharged misconduct is inadmissible to prove a defendant's criminal disposition to commit the charged crime. (Evid.Code, § 1101, subd. (a).) However, such evidence may be admissible if offered to prove other facts such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or consent. (Evid.Code, § 1101, subd. (b).)

In vehicular murder cases, as here, the prosecutor must prove that the defendant acted with implied malice. (People v. Watson (1981) 30 Cal.3d 290, 300.) Implied malice may be established by prior crimes evidence admissible under Evidence Code section 1101, subdivision (b). (People v. Ortiz (2003) 109 Cal.App.4th 104, 111–

15

113 (Ortiz).) "[C]ourts have recognized repeatedly that a motor vehicle driver's previous encounters with the consequences of recklessness on the highway—whether provoked by the use of alcohol, of another intoxicant, by rage, or some other motivator—sensitizes him to the dangerousness of such life-threatening conduct." (Id. at p. 112.) "Here, the evidence of prior driving conduct was offered to prove an intermediate fact (knowledge that conduct is life threatening) necessary to the establishment of the ultimate fact of implied malice, an element in the charges of second degree murder." (People v. Eagles (1982) 133 Cal.App.3d 330, 340 [evidence of excessive speed resulting in a near collision is relevant to knowledge of the great risk of harm of excessive speed].)

For uncharged misconduct to be admissible, it must be sufficiently similar to the charged offenses, and the probative value of the evidence must be both substantial and not largely outweighed by the probability that its admission would create a serious danger of undue prejudice, confusing the issues, or misleading the jury. (People v. Kipp (1998) 18 Cal.4th 349, 369, 371.) We review the court's admission of the evidence for an abuse of discretion. (Ibid.)

2. Analysis

The court did not abuse its discretion in ruling that evidence of the 1994 fatal collision could be offered to show Bucci's knowledge of the dangers of falling asleep while driving. (Evid.Code, § 1101, subd. (b).) The 1994 collision was caused when he fell asleep, and two people died in the resulting collision. According to Bucci's statements at the scene to both Officer Ervin and EMT Bryant, the 2006 collision was also caused when he fell asleep. If the jury believed Bucci's statements that he fell asleep at the wheel in November 2006, it could reasonably infer that Bucci had driven even though he was sleepy or fatigued, and his knowledge of the consequences of falling asleep would be germane to the issue of implied malice.

Bucci argues that, by the time of trial (and the motion in limine), he denied that he fell asleep and claimed instead that he had succumbed to the effects of carbon dioxide to which he was exposed at work. The jury, however, was not obligated to accept Bucci's dry ice theory or reject his prior statements to the authorities that he fell asleep. Accordingly, what Bucci learned from falling asleep at the wheel in 1994 remained relevant and admissible under Evidence Code section 1101, subdivision (b).

Bucci also points out that the prosecutor told the jury in his rebuttal argument that Bucci had not fallen asleep, but deliberately passed in the wrong lane up a hill. Therefore, Bucci urges, evidence of his knowledge from 1994 of the dangers of falling asleep was immaterial. We disagree. In the first place, what the prosecutor asserted in his rebuttal argument cannot render the court's prior in limine ruling erroneous, since the propriety of that ruling must be evaluated in light of what had been presented to the court at the time of the motion. In any event, although the prosecutor argued that Bucci acted with implied malice because he passed in the

16

wrong lane uphill deliberately, the prosecutor also contended in his closing argument that Bucci acted with implied malice if, indeed, he had fallen asleep. It remained possible for the jury to conclude from the evidence that Bucci had fallen asleep while driving in 2006, and the evidence of the 1994 fatalities was therefore substantially relevant to Bucci's knowledge at the time of the charged crimes.FN5

FN5. We also note that, while the prosecutor ultimately argued to the jury that Bucci deliberately passed cars in the wrong lane while approaching the crest of a hill, the evidence of Bucci's 1994 collision would have been admissible to establish implied malice given those facts as well: to show Bucci's knowledge of the danger of driving into oncoming traffic—that is, the likely effects of a collision that could occur if one drives eastbound in a westbound lane deliberately. The experience of a prior head-on collision that left two people dead would have been relevant to whether Bucci knew that driving towards on-coming traffic was likely to kill someone.

We turn next to whether the probative value of the evidence was largely outweighed by the probability the evidence would create undue prejudice, confuse the issues, or mislead the jury. (Kipp, supra, 18 Cal.4th at p. 371.) Among the factors considered in weighing potential prejudice are whether the defendant was convicted of the prior crimes, thus removing any temptation for the jury to punish him for the uncharged offenses, and whether the prior offenses were of a more serious nature than the currently charged crimes, thereby posing a risk of inflaming the jury. (See People v. Ewoldt (1994) 7 Cal.4th 380, 404–405.)

Here, the 1994 incident resulted in Bucci's conviction for misdemeanor vehicular manslaughter. Contrary to his suggestion (which we discuss post ), Bucci was free to introduce evidence of this conviction and punishment to minimize any possibility that the jury might convict him of the charged crimes just to punish him for the 1994 incident. Furthermore, while the 1994 deaths of two people caused by Bucci falling asleep at the wheel are certainly tragic, they are no more inflammatory than the 2006 deaths of two people and injuries to two others caused by Bucci either falling asleep at the wheel again, driving after feeling the disorienting effects of carbon dioxide exposure, or deliberately speeding uphill in the lane of oncoming traffic in order to pass other vehicles. The court did not abuse its discretion in concluding that the evidence of the 1994 incident was admissible. (See Kipp, supra, 18 Cal.4th at p. 372 .)

Lastly, any error in the admission of the evidence pertaining to the 1994 fatal accident was harmless, since there is no reasonable probability that Bucci would have obtained a more favorable verdict if the evidence had not been admitted. (People v. Scheer (1998) 68 Cal.App.4th 1009, 1018–1019.) The jury was expressly instructed, in accordance with CALCRIM No. 375, that it could not consider the evidence for any purpose other than deciding whether Bucci knew that falling asleep while driving is dangerous to human

life: "The People presented evidence that the defendant fell asleep while driving and collided with another vehicle causing the deaths of two people in 1994.... [¶] If you decide that the defendant committed the act, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not: [¶] The defendant knew that falling asleep while driving is dangerous to human life. [¶] Do not consider this evidence for any other purpose except for the limited purpose of determining the defendant's knowledge that falling asleep while driving is dangerous to human life." (Italics added.) The jury is presumed to have followed this instruction. (See People v. Avila (2006) 38 Cal.4th 491, 574.) Bucci fails to establish reversible error.

People v. Bucci, 2010 WL 2512732, at *6-7 (2010).

For the reasons stated by the California Court of Appeal, the undersigned finds that admission of evidence regarding the 1994 collision did not violate fundamental fairness. Evidence of the collision was relevant to the issue of petitioner's knowledge of the dangers of driving while sleeping, on which one of the prosecutor's theories of implied malice was based. The undersigned agrees with the state appellate court that the probative value of the 1994 collision did not outweigh the probability of prejudice. The evidence regarding the 1994 collision was no more inflammatory than the evidence regarding the 2006 collision.

Moreover, as noted by the California Court of Appeal, the jury was instructed that it could consider evidence of the 1994 collision only for the purpose of determining whether petitioner knew that falling asleep while driving was dangerous to human life. A jury is presumed to follow its instructions. Weeks v. Angelone, 528 U.S. 225, 234 (2000). Thus, it is presumed that the jury did not consider evidence for any other improper purpose.

For the reasons discussed above, the undersigned finds that admission of evidence of the 1994 collision did not violate fundamental fairness.

Discussion—Prosecutorial Misconduct (Claim 2)

Petitioner alleges that the prosecutor committed misconduct during closing argument when he argued that there are, "4 dead bodies...he's killed before...it's time to accept responsibility ... he got away with it before ... and he used the same excuse again." (ECF No. 31 at 19.) Petitioner also argues that the prosecutor committed misconduct when he argued to the jury that evidence of the 1994 accident could be used for the improper purpose of demonstrating

18

1    conformity.  (Id. at 21.)

2         *Legal Standard*

3         To obtain federal habeas relief for prosecutorial misconduct on due process grounds, "it is

4    not enough that the prosecutor's remarks were undesirable or even universally condemned."

5    Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal quotation marks omitted).

6    Prosecutorial misconduct merits habeas relief only where the misconduct "so infected the trial

7    with unfairness as to make the resulting conviction a denial of due process."  Id.  (internal citation

8    and quotation marks omitted); Bonin v. Calderon, 59 F.3d 815, 843 (9th Cir. 1995) ("To

9    constitute a due process violation, the prosecutorial misconduct must be so severe as to result in

10   the denial of [the petitioner's] right to a fair trial.").  "[A] criminal conviction is not to be lightly

11   overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct

12   must be viewed in context; only by so doing can it be determined whether the prosecutor's

13   conduct affected the fairness of the trial."  United States v. Young, 470 U.S. 1, 11 (1985).  "In

14   fashioning closing arguments, prosecutors are allowed reasonably wide latitude and are free to

15   argue reasonable inferences from the evidence."  United States v. McChristian, 47 F.3d 1499,

16   1507 (9th Cir. 1995) (internal citation omitted).  "The arguments of counsel are generally

17   accorded less weight by the jury than the court's instructions and must be judged in the context of

18   the entire argument and the instructions."  Ortiz–Sandoval v. Gomez, 81 F.3d 891, 898 (9th Cir.

19   1996) (citing Boyde v. California, 494 U.S. 370, 384–85 (1990)).

20        To grant habeas relief on the basis of prosecutorial misconduct, the misconduct must have

21   been prejudicial:  that is, it must have "had substantial and injurious effect or influence in

22   determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see Karis v.

23   Calderon, 283 F.3d 1117, 1128 (9th Cir. 2002) (holding a claim of prosecutorial misconduct is

24   analyzed under the prejudice standard set forth in Brecht).  Under Brecht, a reviewing court must

25   grant relief if "in grave doubt as to the harmlessness of the error."  O'Neal v. McAninch, 513 U.S.

26   432, 436 (1995).  In assessing prejudice arising from prosecutorial misconduct, the court must

27   consider a number of factors:  (1) whether a curative jury instruction was given, see Greer v.

28   Miller, 483 U.S. 756, 766 n.8 (1987); (2) the weight of evidence of guilt, see Young, 470 U.S. at

19

19 (finding "overwhelming evidence" of guilt); (3) whether the misconduct was isolated or part of an ongoing pattern, see Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir. 1987); (4) whether the prosecutorial misconduct related to a critical aspect of the case, see Giglio v. United States, 405 U.S. 150, 154 (1972); and (5) whether the challenged comment of the prosecutor misstated or manipulated the evidence.  Darden, 477 U.S. at 181–82.

   *Analysis—Did Prosecutor Commit Misconduct By Arguing that Petitioner Had Previously "Gotten Away With It"?*

   Petitioner alleges that the prosecutor committed misconduct when he made the following closing argument:

> He's trying to escalate this, to make it look like, well, I think I must have fallen asleep.  I really don't know.  That's my best explanation, and try and make it consistent with this exposure defense.  That's not what he said.  He didn't say, I was confused.  I don't know.  He said, "I dozed off."  *I submit to you he got away with it before, when he dozed off, and he used the same excuse again.*

(RT at 876 (emphasis added).)

   The California Court of Appeal denied this claim for the reasons stated herein:

> In his rebuttal argument to the jury, the prosecutor honed in on an assertion defense counsel made in closing argument that Bucci had told EMT Bryant " 'I must have dozed off' " rather than "[I] dozed off." (Italics added.) The prosecutor argued: "He's trying to escalate this, to make it look like, well, [']I think I must have fallen asleep. I really don't know. That's my best explanation['] and try and make it consistent with his exposure defense. That's not what [Bucci] said. He didn't say, [']I was confused. I don't know.['] He said, 'I dozed off.' I submit to you he got away with it before, when he dozed off, and he used the same excuse again ." (Italics added.)
>
> Defense counsel did not object, and the prosecutor finished his rebuttal argument. Bucci now contends the prosecutor perpetrated prosecutorial misconduct by saying "he got away with it before."
>
> 1. Waiver
>
> A defendant may generally not complain on appeal of prosecutorial misconduct unless he timely objected and requested that the jury be admonished to disregard the impropriety. (People v. Berryman (1993) 6 Cal.4th 1048, 1072, overruled on other grounds in People v. Hill (1998) 17 Cal.4th 800, 823, fn. 1.)
>
> Here, Bucci did not object to the prosecutor's statement during closing argument. Instead, the day after closing arguments were

concluded, defense counsel stated (outside the presence of the jury): "Yesterday, in the closing, [the prosecutor] referred to ... the idea that [Bucci] fell asleep in 1994 is determinative that he got away with it," and "the representation that he got away with it is completely false, because he was, of course, convicted of a crime and did jail time in 1994." Counsel concluded: "So I just—I don't know what Your Honor would like to do about that, but I did think it was appropriate to make an objection on the record, because that certainly mischaracterizes what happened in 1994 as a result."

Bucci does not contend this objection was timely. Instead, he argues that he should be excused from the requirement of a timely objection because it would have been futile. (People v. Hill, supra, 17 Cal.4th at p. 820; People v. Hamilton (1989) 48 Cal.3d 1142, 1184, fn. 27.) In this case, he insists, it would have been futile to object to the prosecutor's statement during closing argument, because the court did not take action when defense counsel raised the issue the next day.

We are not persuaded. The fact that a trial court denies relief in response to an untimely objection does not in itself mean that a timely objection would have been futile. Furthermore, at the point in this case when defense counsel finally mentioned the matter, he appears to have been merely making a record of his concern, and never actually asked the trial court to do anything—not even to admonish the jury to disregard the prosecutor's comment. So the court responded: "All right. I'm just going to leave it there. I'm not—I have no further input at this time." Nothing in the record suggests that Bucci should be excused from the requirement of making a timely objection to the prosecutor's purported misconduct.

Nonetheless, we need not rely on the doctrine of waiver or forfeiture to resolve the issue of the prosecutor's comment, since Bucci's argument also fails on the merits.

2. Merits

Bucci contends the prosecutor committed misconduct by arguing that Bucci got away with killing two people in 1994, even though he knew that Bucci was convicted and sentenced. Bucci mischaracterizes the prosecutor's statement. The prosecutor did not tell the jury in closing argument that Bucci got away with killing two people in 1994. Nor did he ever state that Bucci had not been convicted or punished for the 1994 fatalities, let alone urge the jury to punish Bucci for the 2006 collision because he got away with killing people in 1994.

Rather, the prosecutor stated: "I submit to you he got away with it before, when he dozed off, and he used the same excuse again." In context, a reasonable interpretation of the prosecutor's point is that Bucci's claim of falling asleep in the 2006 incident was bogus and should not be believed. In other words, the prosecutor's argument was conceivably to the effect that: Bucci got away with claiming he dozed off in 1994, so he claimed it again in 2006, but in this case it was not true.

1
2
3
4

In any event—even if a reasonable juror could interpret the prosecutor's argument in the way Bucci now casts it—Bucci has not established reversible error. "Prosecutorial misconduct is cause for reversal only when it is 'reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from the comment attacked by the defendant.' [Citation.]" (People v. Milner (1988) 45 Cal.3d 227, 245.)

5
6
7
8
9
10
11
12
13

Here, there is no reasonable probability that Bucci would have obtained a more favorable verdict if the prosecutor had not made the subject remark. The prosecutor's statement was not an obvious plea to convict or punish Bucci because of the 1994 fatalities, it constituted a tiny fraction of the prosecutor's overall closing and rebuttal arguments, and it was apparently not so inflammatory or noteworthy as to cause any contemporaneous expression of concern by either defense counsel or the trial court. Furthermore, the trial court instructed the jury that it could not use the evidence of the 1994 fatalities for any purpose other than to determine "the defendant's knowledge that falling asleep while driving is dangerous to human life." Given this instruction pursuant to CALCRIM No. 375, as well as the presumption that the jury followed the instruction, the context and circumstances of the prosecutor's statement, and the strong evidence of implied malice discussed ante, Bucci fails to show that the prosecutor's statement compels reversal.

14

People v. Bucci, 2010 WL 2512732, at *12-13.

15
16

In the answer, respondent first argues that the instant claim is procedurally defaulted based on trial counsel's failure to object, as noted by the California Court of Appeal.

17
18
19
20
21
22
23
24

In order for a claim to be procedurally defaulted for federal habeas corpus purposes, the opinion of the last state court rendering a judgment in the case must clearly and expressly state that its judgment rests on a state procedural bar.  See Harris v. Reed, 489 U.S. 255, 263 (1989). "A claim in a federal habeas petition may be procedurally defaulted if it was actually raised in state court but found to be defaulted on an adequate and independent state procedural ground." Jones v. Ryan, 691 F.3d 1093, 1101 (9th Cir. 2012).  This rule applies even where the state court reached the merits of the claim even after finding the claim procedurally barred.  See,e.g., Harris v. Reed, 489 U.S. 255, 265 n.10 (1989).

25
26
27
28

This action has been pending since November 2011.  (ECF No. 1.)  On December 7, 2011, the undersigned ordered the original petition served on respondent.  (ECF No. 6.)  On May 20, 2014, respondent filed a motion to dismiss on grounds that several claims were either not exhausted or procedurally barred.  (ECF No. 27.)  Respondent has not waived the issue of

procedural default with respect to the instant claim by failing to raise it in the motion to dismiss. See Morrison v. Mahoney, 399 F.3d 1042, 1046 (9th Cir. 2005) (motion to dismiss in habeas is not a responsive pleading that required the state to raise or waive all of its defenses). However, in the interests of judicial economy, the undersigned declines to address respondent's procedural default argument with respect to this claim, as the court has already spent considerable time addressing procedural default in this action. See Lambrix, 520 U.S. 518, 525 (1997).

Turning to the merits of the instant claim, petitioner is not entitled to relief because, under either interpretation of the argument as discussed by the state appellate court, there is no reasonable probability that the argument had an impact on the outcome of the trial. As noted by the California Court of Appeal, the jury was instructed that it could consider evidence of the 1994 collision only for the purpose of determining whether petitioner had knowledge that driving while sleeping was dangerous to human life. A jury is presumed to follow its instructions. See Weeks v. Angelone, 528 U.S. 225, 234 (2000).

Moreover, because the evidence against petitioner was strong, it is not likely that the alleged misconduct had a substantial impact on the verdict. The California Court of Appeal found that there was substantial evidence that petitioner knowingly put people's lives in jeopardy when it rejected his claim challenging the sufficiency of the evidence of implied malice:

> In the matter before us, substantial evidence supported a finding of implied malice. Bucci was speeding up a hill going the wrong direction in a no-passing zone on a highway, where he could not see oncoming traffic on the other side of the crest of the hill and could not return to his correct lane because of the semi-trailers he was trying to pass. Certainly a reasonable juror could conclude that the natural consequences of his conduct were dangerous to life and that his conduct endangered the lives of others—such as the occupants of any vehicle approaching from the other side of the crest of the hill. Indeed, at trial Bucci himself admitted that "passing uphill over a solid no-pass line towards the crest of a hill where you can't see is life-endangering," and "passing multiple vehicles at night within in excess of a speed limit over the solid line is likely to kill somebody." Bucci also conceded he knew the danger of such actions as of November 17, 2006.
>
> Furthermore, substantial evidence supported the conclusion that Bucci was conscious and aware that he was putting people's lives in jeopardy at the time of the collision. There was, for example, evidence that Bucci was not asleep or under the influence of any intoxicating substance when the accident occurred. According to

eye-witnesses, he was not driving erratically when he pulled into the westbound lane to pass Johnson, returned to the eastbound lane in front of her, maneuvered back into the westbound lane, accelerated past Fender and one of the semi-trailers in a no-passing zone, and attempted to pass the second semi-trailer until he struck Jackson head-on. Immediately after the collision, Bucci did not complain of confusion, dizziness, or any effect of dry ice or any other substance, but was instead cogent and responsive to questions and logical in his answers. From this evidence the jury could reasonably conclude that Bucci attempted to pass the semi-trailers going uphill deliberately, in conscious disregard for the risk of life.

Even if the jury accepted Bucci's claim at the scene that he fell asleep, it could reasonably conclude that Bucci acted with implied malice. From his statement to EMT Bryant and Officer Ervin that he dozed off, it could reasonably be inferred that he felt sleepy or fatigued and, notwithstanding his knowledge from the 1994 fatalities of the dangers of falling asleep while driving, continued to drive.

2010 WL 2512732 at *8.

The undersigned has independently reviewed the record and finds the state appellate court's findings regarding the evidence to be accurate.  The undersigned also observes that, although not required, the prosecutor, through defense witnesses, made a good case for motive. Evidence was presented that prior to leaving work on November 17, 2006, petitioner, with the help of co-worker Stephen Martin, loaded his car with Google food and utensils to take to a private catering job.   (See RT at 413, 420, 423-24, 510-11.)  The event was in Lodi, about 1 ½ hours away.  (Id. at 510-11.)  Petitioner left work at approximately 3:30 p.m.  The accident occurred at approximately 6:30.  The prosecutor persuasively argued that petitioner was late for the catering event, which is what caused him to make the unsafe lane change which led to the collision.

While petitioner's defense was that he suffered from involuntary intoxication as a result of exposure to dry ice, the evidence demonstrated that petitioner was able to function quite competently despite this exposure.  The evidence demonstrated that he was able to load his car with food from Google with the help of his friend, start his car, drive it out of the Google parking lot, and then drive for at least 40 to 50 miles, without incident, until the collision occurred.  In other words, the dry ice did not appear to have an impact on petitioner's ability to competently function until the collision.

24

1    Witnesses who interacted with petitioner just before he left work on November 17

2    testified that petitioner appeared cogent.  For example, shipping and receiving clerk Joaquin Ortiz

3    testified that he spoke with petitioner as he was standing next to his truck, and the food was

4    already loaded into his car.  (RT at 510.)  Petitioner told Ortiz  that he was on his way to a

5    catering event at a winery.  (Id. at 511.)  Ortiz testified that while petitioner looked tired, he was

6    cogent and did not mention being ill.  (Id. at 512.)

7    Stephen Martin testified that petitioner asked him to help him load the food into his car for

8    the catering event.  (Id. at 413.)  Martin testified that he and petitioner loaded the food on to

9    wheeled carts.  (Id. at 423-24.)  Martin testified that petitioner did not appear to be confused

10   about the items he was loading.  (Id.)

11   The evidence that petitioner consciously made the lane change that resulted in the

12   collision was, as the state appellate court found, substantial.[2]  For this reason, it is not likely that

13   the prosecutor's argument that petitioner had "got away with it before" had a substantial impact

14   on the jury.  Accordingly, this claim of prosecutorial misconduct is without merit.

15   ////

16   ////

17

18   [2] Evidence was also presented which undermined the opinion of petitioner's expert, Dr. Rutchik.
     Dr. Rutchik testified that his opinion regarding petitioner's exposure to dry ice was based on
19   information he received from petitioner, including that 150 pounds of dry ice was placed in a
     refrigerator approximately one day earlier.  (Id. at 556.)  However, defense witness Joaquin Ortiz
20   provided testimony regarding the condition of the dry ice, of which Dr. Rutchik was not aware.
     Ortiz testified that the dry ice was left on the loading dock for two to three hours before it was
21   refrigerated.  (Id. at 504.)  In addition, the ice was not in pellet form, as testified to by petitioner,
     but in slab form.  (Id. at 502.)  Ortiz also testified that he split the 150 pounds of dry ice up and
22   put it into two refrigerators and one freezer on the loading dock, i.e., not all 150 pounds of dry ice
     was in one freezer or one refrigerator.  (Id. at 507.)  Ortiz also testified that the plan was to move
23   the dry ice to the upstairs refrigerators.  (Id. at 515.)  Ortiz testified that he did not know whether
     the dry ice had been moved upstairs by the afternoon of November 17.  (Id. at 515-16.)
24       On cross-examination, Dr. Rutchik testified that his opinion regarding the effect of the dry
25   ice on petitioner would change if he knew that petitioner had been exposed to less than 150
     pounds of dry ice.  (Id. at 632.)  Dr. Rutchik also testified that his opinion would change if he
26   knew that the dry ice had been left on the loading dock, unrefrigerated for three to four hours the
     morning it was delivered the day before.  (Id. at  634.)  Dr. Rutchik also testified that it "made
27   sense" that dry ice in the form of pellets would sublimate at a rate faster than slabs of dry ice.  (Id.
     at 638.)
28

*Analysis—Did Prosecutor Commit Misconduct by Arguing That Petitioner Acted in Conformity with Character?*

Petitioner argues that the prosecutor improperly argued that the jury could consider evidence of the 1994 collision as evidence that, in 2006, petitioner acted in conformity with his character.  In support of this claim, petitioner cites a portion of the prosecutor's closing argument which, as noted by respondent, contains redactions.  The second amended petition describes the at-issue argument as follows:

> What more do you need than four dead bodies and two people who are ruined as a result of his driving...at this point in time.  Do you think he wasn't a dangerous driving in 1994, when he killed these people ...[s]o he was dangerous back then ... you have to understand ...I didn't put on the '94 evidence, nor did the Court allow it in, to show some type of character in conformity with this additional evidence.  I'm not allowed to do that.  <u>That evidence came in to show that he knew that cars were dangerous, that they can kill, that if you get over in another lane and hit somebody head-on, that you're going to have an accident, to show knowledge --- show that he had knowledge of malice</u> ... **People act out of conformity with character all the time.  And if you realistically look at the evidence in this case, he's acting within his character as, unfortunately, some people do...**

(Second Amended Petition citing RT at 881-82, ECF No. 32 at 19 (emphasis in second amended petition).)

The undersigned herein sets forth the entire, unredacted and unedited portion of the argument referenced by petitioner:

> One thing I want to touch on, [defense counsel] said, in between '94, when he killed two people, and 2006, he didn't have a ticket or something like that, no other accidents, and, therefore, you know he's not a bad driver or person who is a danger.  What more do you need than four dead bodies and two people are ruined as a result of his driving at this point in this case, at this point in time.  Do you think that he wasn't a dangerous driver in 1994, when he killed these people, when he had been up for 35 hours gambling and using dope and drinking and just drives anyway?  He said, "Well, I didn't realize I could fall asleep.  How many of you guys have driven when you're sleepy, and you have to pull over and get a cup of coffee?
>
> That's [defense counsel's] fault, my diagram fell.
>
> So he was dangerous back then.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

The other thing you have to understand is I didn't put on the '94 evidence, nor did the Court allow it in, to show some type of character in conformity with this additional evidence.  I'm not allowed to do that. That evidence came in to show that he knew that cars were dangerous, that they can kill, that if you get over in another lane and hit somebody head-on, that you're going to have an accident, to show knowledge – show that he had knowledge of malice.

The other thing is there's a problem with character evidence, and the problem goes to your common sense.  We all know that people can and do and often do act out of conformity with character.  How many times have you read something and said, Oh, I knew that guy. I don't believe he could ever do that.  He was great in high school. People act out of conformity with character all the time.  And if you realistically look at the evidence in this case, he's acting within character as, unfortunately, some people do.  He's got to get somewhere.  He's late, and it torpedoes.  He's just going to get where he wants to go and drive how he wants to drive.  He's got to choose to make a decision to pass, to accelerate – accelerate as he's passing, get in somebody else's lane, over the double line, go uphill, and try and get by all in one fell swoop, and the cars are moving, too.  He's got to get up enough speed in time to get around them, but that's the trouble with character evidence.  People don't act in conformity with character.

A first time murderer, he's never murdered before.  He acts out of character.  It's just not that probative as to what occurred in this case.  If you want to know what occurred in this case, look at the facts and circumstances surrounding this.

17

(RT at 881-82.)

18

As noted by respondent, the full transcript quoted above shows that the prosecutor did not

19

attempt to argue that petitioner had a criminal propensity, particularly based on evidence of the

20

1994 collision.  Instead, the prosecutor argued that propensity evidence was not reliable in this

21

case.  The undersigned agrees with respondent that the argument quoted above was not unlawful.

22

In any event, as discussed above, the evidence of petitioner's guilt was strong.  For this

23

reason, the argument quoted above did not have a substantial and injurious effect on the jury's

24

verdict.  Accordingly, this claim of prosecutorial misconduct is without merit.

25

Discussion—Ineffective Assistance of Counsel (Claim 4)

26

Petitioner alleges that his trial counsel was ineffective for failing to hire an accident

27

reconstruction expert.  Petitioner argues that "[b]y accepting the accuracy of the prosecution's

28

factual conclusions, the defense was not focused on *whether* petitioner crossed a double-yellow

27

1   line when initiating his passing maneuvers, but rather on *why* petitioner crossed the double-solid

2   line." (ECF No. 32 at 23.)

3   *Procedural Default*

4   In the answer, respondent argues that petitioner's ineffective assistance of counsel claim is

5   procedurally defaulted because the superior court denied this claim as successive, citing In re

6   Clark, 5 Cal.4th 750, 774-75 (1993). As discussed above, respondent has not waived the issue of

7   procedural default with respect to this claim by failing to raise it in the initial motion to dismiss.

8   See Morrison v. Mahoney, 399 F.3d 1042, 1046 (9th Cir. 2005) (motion to dismiss in habeas is

9   not a responsive pleading that required the state to raise or waive all of its defenses). However, in

10   the interests of judicial economy, the undersigned declines to address respondent's procedural

11   argument with respect to this claim. See Lambrix, 520 U.S. at 525.

12   *Legal Standard for Ineffective Assistance of Counsel Claims*

13   The Sixth Amendment guarantees "the right to effective assistance of counsel." McMann

14   v. Richardson, 397 U.S. 759, 771 n. 14 (1970). Ineffective assistance of counsel claims are

15   analyzed under the framework set out by the Supreme Court in Strickland v. Washington, 466

16   U.S. 668 (1984). In Strickland, the Supreme Court held that there are two components to an

17   ineffective assistance of counsel claim: "deficient performance" and "prejudice." 466 U.S. at

18   694. Establishing "deficient performance" requires the movant to show that counsel made errors

19   so serious that she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id.

20   at 687. "Deficient performance" means representation that "fell below an objective standard of

21   reasonableness." Stanley v. Cullen, 633 F.3d 852, 862 (9th Cir. 2011) (citing Strickland, 466

22   U.S. at 688).

23   To demonstrate prejudice, the movant must show that "there is a reasonable probability

24   that, but for counsel's unprofessional errors, the result of the proceeding would have been

25   different." Strickland, 466 U.S. at 694. "It is not enough 'to show that the errors had some

26   conceivable effect on the outcome of the proceeding.'" Harrington v. Richter, 562 U.S. 86, 104

27   (2011) (quoting Strickland, 466 U.S. at 693). A court need not determine whether counsel's

28   performance was deficient before examining the prejudice suffered by the movant as a result of

1   the alleged deficiencies.  Strickland, 466 U.S. at 697.

2          *Analysis*

3          Petitioner alleges that his counsel was ineffective for failing to hire an accident

4   reconstruction expert.  (ECF No. 32 at 26.)  Petitioner alleges that there is reasonable probability,

5          that had an expert testified that petitioner's passing maneuvers
    began with a lawful crossing of the centerline, the evidence of the
6          passing zone deficiencies (length and line-of-sight, as stated at Dkt.
    17, p. 8) would have then been relevant and admissible; that, at the
7          very least, petitioner's culpability would have been found by the
    jury to be less than that required to find guilt beyond a reasonable
8          doubt of the implied malice counts.

9   (Id.)

10         The background to this claim is discussed, in part, in the March 13, 2012 findings and

11  recommendations addressing petitioner's motion to stay this action pending exhaustion of

12  additional claims.  (ECF No. 17.)   In relevant part, the findings and recommendations state,

13         A civil wrongful death action was filed against petitioner and the
    State of California regarding the incident on which his conviction is
14         based.  (Dkt. No. 10-6 at 2.)  The trial in the case was held in June
    and July of 2011.  (Id. at 5.)  The jury assessed damages of 29
15         million dollars.  (Id.)

16         In late September 2011, petitioner's family retained the lawyer who
    is representing petitioner in the instant action, Mr. William L.
17         Schmidt, to assess whether grounds existed to prosecute a habeas
    action.  (Dkt. No. 10-5 at 2.)  Mr. Schmidt reviewed documents
18         from the civil action, including depositions taken of expert
    witnesses in June 2011.  (Id.)  According to Mr. Schmidt, the expert
19         testimony revealed that petitioner had not committed an illegal act
    by crossing a double-yellow line when he initiated his passing
20         maneuver, but also that Highway 12 was defective in its design,
    construction and maintenance, and that the State of California was
21         aware of those deficiencies for several years preceding the
    November 2006 incident on which petitioner's conviction is based.
22         (Id.)   According to Mr. Schmidt, the evidence in the civil trial
    established, as conceded by the State of California, that an adequate
23         line-of-sight in the area of the collision for a two-lane highway at
    55 mph was at least 1,950 feet, but on Highway 12 it was only 300-
24         350 feet; that the shoulders on either side of the roadway should
    have been at least 8 feet wide, but in fact did not exist on Highway
25         12.  (Id.)

26  (ECF No. 17 at 8.)

27         Turning to the merits of the instant claim, the undersigned first observes that evidence

28  regarding whether petitioner began his lane change while still in a legal passing zone was not

29

relevant to his defense.  As discussed above, petitioner's defense was that he was involuntarily

intoxicated as a result of being exposed to dry ice.  Based on this exposure to dry ice, petitioner's

defense was that he did not knowingly make the dangerous pass which led to the collision.  Based

on this defense, petitioner's knowledge of whether the line was striped or solid when he began his

lane change was not relevant to his defense.  Therefore, petitioner's counsel was not ineffective

for failing to pursue an inconsistent defense that was contrary to petitioner's testimony.  See Turk

v. White, 116 F.3d 1264, 1266–67 (9th Cir. 1997) (concluding that once counsel reasonably

selects a defense, failing to present an alternative and inconsistent defense is not ineffective

assistance of counsel).  On this ground, petitioner's ineffective assistance of counsel claim should

be denied.

> For the reasons stated herein, the undersigned further finds that testimony from an
accident reconstruction expert would not have changed the outcome of the trial.

> In support of his claim that counsel was ineffective for failing to call an accident
reconstruction expert, petitioner argues that the testimony of witnesses Fender and Johnson that

petitioner passed Fender in a no passing zone was false.  (ECF No. 32 at 27.)  Petitioner argues

that the uncontroverted opinions of the 3 accident reconstruction experts presented during the

civil case demonstrated that petitioner began his pass in a legal passing zone.  (Id. at 28.)

Petitioner argues that this evidence "works to diminish petitioner's culpability for the accident, he

reasonably assumed that the passing area was of sufficient distance to safely pass, thereby

negating the implied malice element, if not an estoppel by entrapment defense."  (Id.)  Petitioner

argues that by "permitting/inviting vehicles to pass, the State was in effect telling drivers that

there was sufficient distance and line-of-sight to do so, such that petitioner may not be prosecuted

for relying on that reasonable inference."  (Id.)

> The undersigned summarizes the relevant testimony of these witnesses herein.

> Johnson testified that on November 17, 2006, she was driving eastbound on Highway 12.
(RT at 123-24.)  Highway 12 is a two lane highway.  (Id.)  Johnson testified that she was driving

the speed limit, 55 miles per hour. (Id. at 126.)  Johnson testified that there was a lot of traffic on

the highway that evening going both ways.  (Id.)  She saw a car, later identified as being driven

1   by petitioner, pass her car.  (<u>Id.</u> 125.)  She testified that after passing her, petitioner's car did not

2   stay in front of her for very long and made another pass.  (<u>Id.</u> at 129.)  She estimated that

3   petitioner was driving about 65 to 70 miles per hour.  (<u>Id.</u>)

4        Johnson testified that at the time petitioner initiated his second pass, the control lines on

5   the road were solid.  (<u>Id.</u> at 131.)  Johnson testified that when petitioner made his second pass, the

6   road was going up a hill.  (<u>Id.</u>at 132.)  Johnson testified that petitioner was trying to pass multiple

7   vehicles going up the hill.  (<u>Id.</u> at 133.)  Johnson testified that she could not see over the crest of

8   the hill.  (<u>Id.</u>)

9        Fender testified that on November 17, 2006, he was driving eastbound on Highway 12.

10  (<u>Id.</u> at 98.)  There were two tractor-trailer box vans driving in front of Fender at the time of the

11  collision.  (<u>Id.</u> at 99.)  Fender testified that there were five or six car lengths between him and the

12  truck in front of him.  (<u>Id.</u>)  Fender testified that he was driving approximately 50 miles per hour.

13  (<u>Id.</u> at 100.)  Fender testified that a car, later identified as being driven by petitioner, attempted to

14  pass him as he drove up a hill.  (<u>Id.</u> at 101.)  Fender testified that the area of the road going up the hill

15  was a no passing zone.  (<u>Id.</u> at 101.)

16       The deposition transcripts of accident reconstruction experts Mark Shattuck and James

17  Barry, from the civil trial, are attached as exhibits to the second amended petition.  (ECF Nos. 32-

18  9, 32-10.)  As described herein, Shattuck and Barry testified that while petitioner began his pass

19  of Fender in a passing zone, he was in a no-passing zone by the time he was actually passing

20  Fender.

21       Shattuck based his estimate on when petitioner passed Fender on Fender's statement to the

22  police.  (ECF No. 32-9 at 29-30.)  Shattuck testified that he accepted Fender's estimate as

23  accurate because he had no reason to discount it, "[a]nd it was measured shortly after the accident

24  by the police officers. So I think it might be the best state of evidence we have."  (<u>Id.</u> at 30.)

25  Shattuck testified that there was no evidence to the contrary.  (<u>Id.</u>)

26       Shattuck testified that petitioner started passing Fender in a passing zone, but "as he's

27  passing Fender's vehicle that's about where the single yellow line would have started..."  (<u>Id.</u> at

28  35.)  Shattuck testified that at some point during the pass, the solid yellow line ought to have been

visible to petitioner.  (Id. at 37.)   Shattuck testified that petitioner drove 65 to 70 miles per hour

during the pass.  (Id. at 31.)  Shattuck also testified that the distance between petitioner and Ms.

Jackson at the speeds they were driving was 300 to 350 feet.  (Id. at 15-16).  This distance

translated into approximately 1 ½ to 2 second of time between them before the impact.  (Id. at

16.)

Expert Barry testified that petitioner began his pass of Fender approximately 209 feet

from the beginning of the solid yellow line.  (ECF No. 32-10 at 16.)  Barry testified that at the

time petitioner's car was directly next to Fender's car, petitioner was approximately 126 feet into

the solid line area.  (Id. at 16.)  Barry testified that his opinion regarding when petitioner began

his pass of Fender was very close to the opinions of accident reconstruction experts Blythe and

Shattuck.  (Id. at 16.)  Barry also testified that petitioner drove approximately 70 miles per hour

when he passed Fender.  (Id. at 18.)  Barry testified that given the vertical curve of the road where

the accident occurred, he estimated that petitioner saw victim Jackson approximately two seconds

before the impact.  (Id. at 28.)

Petitioner has also provided a letter sent to him by the attorney, Ian Gordon, who

represented him in the civil trial summarizing the testimony of the experts and discussing the

evidence from the civil trial.  This letter states, in relevant part,

> Deposition of Mark Shattuck, PhD—he was the plaintiff's accident
> reconstruction expert, and was the witness who performed the video
> re-enactment of the accident and the video re-enactment of what
> would have occurred if you and Ms. Jackson had just one additional
> second to see each other.  Both of you would have missed each
> other.  I am including with this deposition the CD which should
> have the re-enactments on it.  It is in the sleeve attached to the back
> of his transcript.
>
> As I have indicated to you previously, the sight distance at the area
> of the collision for eastbound vehicles (your direction) was only
> 300 to 350 feet, which is substandard.  The road needed at least
> 1950 feet of sight distance for a two lane highway with a speed
> limit of 55 mph.  The State of California admitted at trial, as it had
> to, that the sight distance was substandard.  The road shoulders at
> the area of your accident were substandard.  There were none, and
> there should have been shoulders 8 feet wide.  The State also
> admitted at trial that the shoulders were substandard.  The effect of
> these substandard conditions were magnified in your case because
> where you began passing of Mr. Fender's vehicle was a legal
> passing zone.

Kirk Barry—Mr. Barry was my accident reconstruction expert. His position transcript is also enclosed. He testified that you in fact began your pass in a legal passing area, but continued into an illegal zone; however, when you began the legal passing maneuver, there was only 300-350 feet of sight distance to allow you to see an oncoming motorist, which as we know as not sufficient for you to see the Jackson vehicle.

These two experts testimony taken together established that you began a legal pass, did not have sufficient sight distance to be able to see oncoming vehicles (due to the vertical, hilly, curves in the road which reduced the sight distance to substandard levels), and once you entered the non-passing zone, had no recovery area due to lack of road shoulders. That is why, if you had one additional second of sight distance for you and Ms. Jackson to have seen each other, the accident would not have occurred, and that is why Shattuck did the second video re-enactment.

Harry Krueper and Weston Pringle – these are plaintiffs and my highway design experts. They each testified that Highway 12 was in a dangerous condition due to the substandard conditions discussed above, and each concluded that a median barrier should have been installed at the area of this accident no later than the mid to late 1990s. Their conclusions were based on the fact the State of California was aware through its own documents that from 1991 through the date of your accident there had been 125 cross center line head-on collisions on Highway 12 between Suisun and Rio Vista, which caused 47 motor deaths. These experts also testified that the State was aware during this time frame that motorists passed on the highway due to the vast amounts of large truck traffic, which was exactly the situation you found yourself in on the evening of the incident; yet, the State did nothing to correct this dangerous situation.

(ECF No. 32-17 at 3-4.)

To summarize the relevant testimony, Johnson testified that petitioner initiated the pass in a no-passing zone. Fender testified that petitioner passed him in a no-passing zone, although he did not specifically testify that petitioner initiated the pass in a no-passing zone. Shattuck and Barry clarified that petitioner initiated the pass in a passing zone, but was in a no-passing zone when he actually passed Fender. Shattuck and Barry also testified that petitioner and Jackson had only a few seconds to see each before the accident. According to Mr. Gordon, the State of California admitted that this line of sight was substandard.

Even if the jury had heard the testimony of accident reconstruction experts that petitioner initiated the pass of Fender in a no-passing zone, and that the line of sight was substandard, it is extremely unlikely that the outcome of the trial would have been different. As noted by the

Superior Court, which also denied the instant claim on procedural grounds, testimony from

accident reconstruction experts did not "point unerringly to petitioner's reduced culpability, nor

does it undermine the prosecution's entire case."  (Respondent's Lodged Document H at 3.)

Petitioner's alleged new evidence consists of the depositions of accident reconstruction experts Shattuck and Barry who opine that petitioner began his first lane change to pass the Fender vehicle about 209 feet before the solid median line.  (Deposition of James Barry, June 17, 2011, pp. 13-14; Deposition of Mark Shattuck, June 8, 2011, pp. 31-32.)  Petitioner also includes a declaration from Stacy Nygard, a juror in his criminal case, and argues that Ms. Nygard's declaration supports that his culpability turned on the fact that he crossed the solid median line.

However, petitioner's culpability in this case did not hinge on where exactly petitioner changed lanes and passed the Fender vehicle, it hinged on the evidence that, after that point petitioner was driving in a dangerous manner and knew the manner in which he was driving could have fatal consequences.  (See People v. Bucci (June 23, 2010, A124228 ) [nonpubl. Opn.] at p. 12.)  The alleged new evidence does not change the fact that after the solid median line began, petitioner continued to speed eastbound uphill at night in the westbound lane trying to pass a car and two semi trucks.  The new evidence shows that, after the solid median line began, petitioner drove for about 1050 to 1100 feet and for about ten to thirteen seconds until the point of impact.  (Depositon of Mark Shattuck, June 8, 2011, pp. 35-36; Deposition of James Barry, June 17, 2011, p. 20.)  Ms. Nygard's declaration does not support that she or any other juror would not have found petitioner guilty if the alleged new evidence had been presented.  On balance, the new evidence does not point unerringly to petitioner's reduced culpability or undermine the prosecution's entire case as is required for habeas relief.

Moreover, with regard to his related claim that trial counsel performed deficiently by failing to properly investigate the collision and hire accident reconstruction experts to establish that he never crossed a solid median line, petitioner fails to show that trial counsel performed in an objectively deficient manner.  (Strickland v. Washington (1984) 466 U.S. 668, 687.)  Petitioner's defense at trial was that he was involuntarily intoxicated due to dry ice exposure.  He testified that he was exposed to dry ice at work and could not remember how he got onto Highway 12 or trying to pass a truck.  He presented medical experts to testify about dry ice exposure and the effects of hypoxia.

Considering petitioner's testimony and his dry ice defense, it cannot be said that counsel's failure to further investigate where petitioner exactly changed lanes was unreasonable.  (Strickland, supra, 466 U.S. at p. 691.)  It would have been inconsistent with petitioner's testimony and dry ice defense to argue that petitioner was less culpable because he intentionally began and completed a lane change at a specific point before the solid median line, such that he

was purposefully driving.  Trial counsel's failure to investigate and present evidence regarding where precisely petitioner began his lane change could easily be considered a reasonable strategic choice, particularly in light of the fact that petitioner claimed "new evidence" confirms that petitioner either regained the westbound lane while travelling eastbound after the solid line began or continued travelling eastbound in the westbound lane after that.  (Ibid.)

Moreover, petitioner fails to show prejudice because it is not reasonably probable that the result of the trial would have been different had the jury considered the new evidence provided by experts Shattuck and Barry.  (Strickland, supra, 466 U.S. at p. 694.) *Whether or not petitioner began his lane change before or after the solid yellow median does not change the fact that he was driving in a dangerous manner.*  It is highly unlikely that the result of the trial would have been different had the jury considered the new evidence that petitioner now relies on.

(Id. at 3-5 (emphasis added).)

The undersigned agrees with the reasoning of the Superior Court that whether or not petitioner began his lane change before or after the solid yellow line began does not change the fact that he drove in a dangerous manner.[3]  As noted by the Superior Court, the evidence presented at petitioner's criminal trial demonstrated that after the solid median line began, petitioner continued to speed eastbound uphill at night in the westbound lane trying to pass a car

---

[3]   The declaration of juror Stacy Nygard is attached as an exhibit to petitioner's second amended petition.  (ECF No. 32-8.)  Nygard states, in relevant part,

Later, after the state court of appeal affirmed the judgment of conviction, our local newspaper, the Daily Republic, reported that the accident had occurred as a result of Mr. Bucci falling asleep at the wheel.  I wrote a letter to the editor of the newspaper, which was published on July 15, 2010, in which I attempted to correct the erroneous news report.  I wrote, 'In fact, we convicted him for willfully and intentionally crossing the double yellow line in an effort to get around two big rigs and a passenger vehicle.  He did fall asleep at the wheel in his accident in Reno, NV., but his most recent "accident" on Highway 12 wasn't a case of falling asleep at the wheel.  At least we jurors didn't believe his excuse."

(Id. at 2.)

The undersigned agrees with the Superior Court that juror Nygard's declaration does not support petitioner's claim that she or any other juror would not have found petitioner guilty if accident reconstruction experts had testified that petitioner initiated his pass of Fender in a passing zone.

35

1    and two semi-trucks.  Johnson also testified that there was a lot of traffic on Highway 12 that

2    evening, going in both directions.  The Superior Court noted that the new evidence shows that,

3    after the solid median line began, petitioner drove for about 1050 to 1100 feet and for about ten to

4    thirteen seconds until the point of impact.  That petitioner continued to drive in this dangerous

5    and reckless manner for this period of time was not exonerating.  In addition, expert Shattuck

6    testified at his deposition that the solid yellow line was "available" for petitioner to see after he

7    began his pass of Fender.

8         Petitioner also suggests that the accident reconstruction experts testified in their

9    depositions that petitioner should have reasonably assumed that he had a sufficient distance to

10   safely pass based on where the no-passing zone began.  This argument is without merit.  As

11   discussed above, expert Shattuck testified that the solid yellow line was "available" for petitioner

12   to see when he made his pass.  (ECF No. 36 at 50.)   Expert Barry testified that petitioner traveled

13   in the westbound lane 13 for thirteen seconds before the collision.  (ECF No. 32-10 at 22.)  At

14   trial, petitioner himself admitted that "passing uphill over a solid no-pass line towards the crest of

15   a hill where you can't see is life endangering."  (RT at 355.)  Petitioner also agreed that "passing

16   multiple vehicles at night uphill in excess of a speed limit over the solid line is likely to kill

17   somebody."  (Id.)   Petitioner's claim that the accident reconstruction experts would have testified

18   that he was somehow falsely lured into thinking that he could make a safe pass based on the

19   conditions of the road is without merit.[4]

20        For the reasons discussed above, the undersigned finds that petitioner was not prejudiced

21   by trial counsel's failure to call an accident reconstruction expert.  Accordingly, petitioner's

22   ineffective assistance of counsel claim is without merit and should be denied.

23

24   [4]  In support of his motion to stay this action pending exhaustion of additional claims, petitioner
     included a letter addressed to his federal habeas counsel from the lawyer who represented the
25   plaintiff's in the state civil action, Thomas Brandi.  (ECF No. 10-6.)  In this letter, Mr. Brandi
     stated that the collision involving petitioner would have been prevented if the state had installed a
26   median barrier.  (Id. at 5.)  Mr. Brandi summarized the evidence but also wrote that, "In doing so,
     [petitioner] was like countless others before him who passed improperly."  (Id. at 14.)  Evidence
27   that the State of California should have installed a median barrier also would not have exonerated
     petitioner in his criminal trial.
28

1    Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

2    habeas corpus be denied.

3    These findings and recommendations are submitted to the United States District Judge

4    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

5    after being served with these findings and recommendations, any party may file written

6    objections with the court and serve a copy on all parties.  Such a document should be captioned

7    "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

8    he shall also address whether a certificate of appealability should issue and, if so, why and as to

9    which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

10   applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. §

11   2253(c)(3).  Any response to the objections shall be served and filed within fourteen days after

12   service of the objections.  The parties are advised that failure to file objections within the

13   specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951

14   F.2d 1153 (9th Cir. 1991).

15   Dated:  September 23, 2015

16

17   KENDALL J. NEWMAN
     UNITED STATES MAGISTRATE JUDGE

18

19

20

21
     Bucci.157(2)
22

23

24

25

26

27

28

37